**DECLARATION**
(ORCP Rule 1E)

I, _Aaron Dale Eaton_ , do declare that:

There are documents mentioned in this response that I can not find to re-supply them to this court. All documents mentioned and not supplied have been sent to this court in past response to Eaton v. Eynon et al response to summary Judgment filed on 10-27-21 doc# 121 and will be found with filed original response.

"I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE FOR USE AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY."

Dated this _9th_ day of _March_ , 20_22_.

_Aaron Dale Eaton_
(Signature)

Print Name: _Aaron Dale Eaton_
S.I.D. No. _14987682_

**STATE OF OREGON**
**DEPARTMENT OF CORRECTIONS**
**Two Rivers Correctional Institution**
**82911 Beach Access Road**
**Umatilla, OR. 97882**

**INTEROFFICE MEMO**

**DATE:** May 11, 2020
**TO:** Mr. K. Jackson Assistant Superintendent of Security
**FROM:** Lieutenant J. Robinson DPSST#53456
**SUBJECT:** Possible mold in showers (Unit 2)



PHOTO NUMBER: ONE

PHOTO NUMBER: TWO

PHOTO NUMBER: THREE

PHOTO NUMBER: FOUR

| PHOTOS TAKEN BY: | Lieutenant J. Robinson | | |
|---|---|---|---|
| LOCATION | Unit 2 | TIME: | 7:50pm |
| PHOTO 1 | Shower seat (Bottom Tier Shower) | | |
| PHOTO 2 | Outside of shower (Bottom Tier Shower) | | |
| PHOTO 3 | Inside of shower (Top Tier Shower) | | |
| PHOTO 4 | Inside of shower (Top Tier Shower) | | |

EATON-EMAILPROD-000029



**STATE OF OREGON**
**DEPARTMENT OF CORRECTIONS**
**Two Rivers Correctional Institution**
**82911 Beach Access Road**
**Umatilla, OR. 97882**

**INTEROFFICE MEMO**

**DATE:** May 11, 2020
**TO:** Mr. K. Jackson Assistant Superintendent of Security
**FROM:** Lieutenant J. Robinson DPSST#53456
**SUBJECT:** Possible mold in showers (Unit 2)



PHOTO NUMBER: ONE

PHOTO NUMBER: TWO

PHOTO NUMBER: THREE

PHOTO NUMBER: FOUR

| PHOTOS TAKEN BY: | Lieutenant J. Robinson | | |
|---|---|---|---|
| LOCATION | Unit 2 | TIME: | 7:50pm |
| PHOTO 1 | Shower seat (Bottom Tier Shower) | | |
| PHOTO 2 | Outside of shower (Bottom Tier Shower) | | |
| PHOTO 3 | Inside of shower (Top Tier Shower) | | |
| PHOTO 4 | Inside of shower (Top Tier Shower) | | |

Eaton, Aaron (IM) SID#14997682 v. Eynon, et al.; 2:20-CV-1251-SI
EATON-PROD-404

Eaton, Aaron (IM) SID#14997682 v. Eynor



# EXHIBIT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF OREGON**

Aaron Dale Eaton,
**PLAINTIFF**

**CASE NO.** 2:20-CV-01251-SI

V

Two Rivers Correctional Institution
Grievance coordinator Rossie Eynon;
Two Rivers Correctional Institution
Physical Plant Manager Stark;
Two Rivers Correctional Institution
Physical Plant Asst. Manager Darcy;
Two Rivers Correctional Institution
Superintendent T. Blewett;
The Oregon Dept. Of Corrections.

**DECLARATION OF**
Larry Beasley

**DEFENDANTS**

I Larry Beasley_____, Do declare that the following is true and correct to

the best of my personal first hand knowledge and my personal belief;

I have resided here at Two Rivers Correctional Institution (T.R.C.I.) 82911 Beach Access

Road Umatilla, OR. 97882 Phone Number (541) 922-6050 in the care and custody of O.D.O.C.

Since: 2013 .

I decontaminated The unit Two showers abouT
a month prior To physical plant Taking photos
of Them on 5-8-20.
I Am The bio-hazard orderly authorized To
use bleach when officers Tell me To and
when to use it.

**"I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST OF MY**
**KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE FOR USE AS**
**EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY."**
Dated this 8 day of May 2020.    X Larry Beasley

EXHIBIT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON

*Aaron Dale Eaton,*

**PLAINTIFF**

**CASE NO.**

V

**Two Rivers Correctional Institution
Grievance coordinator Rossi;
Two Rivers Correctional Institution
Physical Plant Manager Stark;
Two Rivers Correctional Institution
Physical Plant Asst. Manager Darcy;
Two Rivers Correctional Institution
Superintendent T. Blewett;
The Oregon Dept. Of Corrections.**

# EXHIBIT

**DECLARATION OF**
*Larry  Beasley*

**DEFENDANTS**

I *Larry  Beasley*             , **Do declare that the following is true and correct to**

the best of my personal first hand knowledge and my personal belief;

I have resided here at Two Rivers Correctional Institution (T.R.C.I.) 82911 Beach Access

Road Umatilla, OR. 97882 Phone Number (541) 922-6050 in the care and custody of O.D.O.C.

Since:_____.

*I am the bio-hazard Orderly, I was told a few
months ago to bleach the showers due to mold
in them.
I have not been instructed to clean the
showers again and the officers know that
the Mold is back.*

**"I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST OF MY
KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE FOR USE AS
EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY."**
Dated this *23* day of *July* 2020.

*Larry Beasley*

*Plaintiff    Haven Dale Eaton v Eynan et al.*
*Case # 2:20-cv-01251-SI*

# EXHIBIT

**DECLARATION**
( ORCP Rule 1E ) ( 28 USC § 1746 )

I, _Nickey L. Nolen_ _____ AIC at TRCI, do declare that:

1. I am a first person witness over the age of 18 and am competent to give account of the facts reported within this declaration or I have actual first hand knowledge of the events that I am testifying to by giving this statement.

On 5/8/2020 on Housing unit two I was assisting in the cleaning of the handicap shower doing a "deep clean" of the walls, seat and floor tile. I lifted up the handicap seat in the handicap shower and I found visible black mold on the bottom of the seat, all along the underside of the wood and down some of the metal pipes that support the entire chair. Along with the visible black mold I found built up lime stains that ran down the wall and down the corner of the shower.

I know that it was black mold that I found under the handicap seat in the handicap shower because of prior experience I have had with my own house and black mold issues so I have experience with what black mold is and what black mold looks like. What I found under the handicap shower seat was black mold and I cleaned all of the black mold off of the seat with Robert Byers w/o protective gear.

"I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE FOR USE AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY."

Dated this _12_ day of _May_ _____, 2020.

_____
(Signature)
Print Name: _Nickey L. Nolen_
S.I.D. No. _15543726_
82911 Beach Access Rd.
Umatilla, OR. 97882

# EXHIBIT

PAGE  1 Of 1  DECLARATION

Aaron Daly Eaton
v
Eynon et al.

Case # 2:20-cv-01251-SI

# EXHIBIT

## DECLARATION
( ORCP Rule 1E ) ( 28 USC § 1746 )

I, _Robert Jerome Byers_ AIC at TRCI, do declare that:

1. I am a first person witness over the age of 18 and am competent to give account of the facts reported within this declaration or I have actual first hand knowledge of the events that I am testifying to by giving this statement.

I was on the Unit (unit two) when physical plant manager Stark came to the unit to do an inspection of all of the Housing unit showers.

Physical plant manager Stark took pictures of all of the alleged black mold sites. This was on or about May 8th, 2020.

On May 8th and 9th, 2020 I was deep cleaning showers 1, 2, 3 — and on May 10th, deep cleaning shower 4 which is the Handicap shower. AIC Nolen showed me where he had found by being directed to it by AIC John Wayne, and I seen with my own eyes — more mold.

On or about May 11th, 2020 Lt. Robenson came to the Unit w/a Camra and had gotten AIC Aaron Eaton who took Lt. Robenson on a tour of all of the showers and even more mold was found. Lt. Robinson confirmed that the shower molding has visible mold and he made a promise it would be cleaned.

"I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE FOR USE AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY."

Dated this _12_ day of _May_, 2020.

(Signature)
Print Name: _Robert J. Byers_
S.I.D. No. _CO311965_
82911 Beach Access Rd.
Umatilla, OR. 97882

PAGE 1 Of 1 DECLARATION


EXHIBIT

MICHAEL C. WHITE, MD
PO Box 572
White Salmon, WA 98672


I, Michael C. White, MD do hereby declare under penalty of perjury:

1. I am a licensed medical doctor in the state of Oregon, with 41 years of active medical practice. My practice history includes 25 years of Emergency Medicine, American Board of Emergency Medicine certification for 30 years, Medical Director for Oregon Youth Authority at the North Coast (drug and alcohol) and Tillamook (sex offender) units for 8 years, and prior Medical Director for correctional facilities at Tillamook, Linn, Benton, Polk, and Columbia counties. I have also been a primary care physician for 17 years at Newberg Urgent Care and Medical Center, Newberg, Oregon. I have been the Medical Director for Hospice Care of Northwest in Salem and Portland, Oregon, as well as Medical Director at Chronic Pain Clinic of Portland. I have provided medical review for multiple legal cases and testified as an expert witness. Further experience is detailed in the attached Curriculum Vitae. (Attachment A)

2. At the request of Mr. Aaron Eaton, Adult In Custody (AIC) at Snake River Correctional Institute, I have reviewed current and past literature regarding health effects of mold and fungus exposure, and offer my declaration in respect to this.

3. Centers for Disease Control and Prevention (CDC) provides general information and recommendations concerning exposure to molds, effect on health, and remediation. (Att. B) Mold is caused by several types of fungus that require high humidity or moisture to grow. Building materials, including dry wall, wood products, ceiling tiles, insulation, or any cellulose containing material are prone to mold growth if they are damp, especially in areas such as showers, bathrooms, and areas of water leakage or flooding. The effect of mold growth on humans is variable, but can cause chronic upper respiratory symptoms such as stuffy nose, recurrent sinus infections, wheezing, or red and itching eyes and skin. People with allergy to mold or chronic lung disease such as asthma, can have intense reactions and inflammation with mold exposure. (Att. C) Institute of Medicine (IOM) in 2004 reported there was sufficient evidence

to associate indoor mold exposure with chronic upper respiratory symptoms and wheezing in otherwise healthy individuals, asthma exacerbation, and pneumonia in immune-compromised individuals. (Att. D) Some molds, such as Stachybotrys Chartarum (commonly called black mold) give off a gas-like toxin, which is associated with a variety of symptoms and conditions. (Att. E)

4.  The CDC reports that there are no reliable tests available for mold related diseases and that specific mold identification is controversial and usually not needed.  The presence of mold, indicated by visual discoloration or odor, and reported symptoms from patients exposed to the environment, should be sufficient evidence to alert authorities of a mold problem. (Att. F)

5.  The proper responses to suspected mold/fungus related conditions should be:  1) eliminate or limit exposure to the offending environment, 2) clinical evaluation and treatment for immediate health issues, and 3) remediation of the environment involved to eliminate mold and dampness.  Clinicians should assist their patients in assessing the evidence of mold exposure, contacting the responsible employer, landlord, or responsible persons to avoid repeat exposures.  Ignoring environmental mold exposure places individuals in further danger for more serious health issues, which include fungal infections in the sinuses and lungs, and chronic lung damage. Clinicians should assess patients for disease with pulmonary function testing, imaging, and lab tests.  If symptoms do not respond to initial therapy, referral to the appropriate specialist is warranted, such as Pulmonologist, Otolaryngologist or Allergist. (Att. G)

6.  Remediation of the environment may involve simple cleaning with antifungal cleaners, or removal of mold contaminated materials, repair of water damage, improved ventilation, and humidity control.  AIC's obviously have limited influence to affect change in their environment, which makes the role of their clinicians even more critical to advocate for the AIC.  My experience with ODOC has found that AICs' complaints are often ignored or even sanctioned.  For example, if their work environment is potentially hazardous, they may be given the choice of not returning to the work area, at which time they often are disciplined or placed in isolation.  The inmate is placed in an untenable position of choosing a potentially toxic work

environment or being disciplined. In my work with AIC's, I have experienced several complaints regarding mold exposure in both work and living spaces, specifically at Deer Ridge Correctional Facility and Snake River Correctional Institute.

7. It is my opinion that environmental mold/fungus exposure can be hazardous to vulnerable individuals, and that repeated exposure can cause serious health issues which can result in chronic disease and irreparable organ damage. There are guidelines for recognition of mold/fungus exposure, treatment, and remediation that are easily referenced. Neglect of the mold/fungus toxic environment can cause unnecessary health damage and suffering. It is critical for medical personnel to advocate for their patients, especially the ones who cannot easily advocate for themselves, so that potentially toxic exposures can be eliminated and proper remediation occur.

8. I declare that the above statement is true to the best of my knowledge and belief.


MICHAEL WHITE, MD

June 28, 2021

ATTACHMENTS


Attachment A: Curriculum Vitae, Michael White, MD.

Att. B: CDC and Prevention/Mold. https://www.cdc.gov/mold.

Att. C: ibid.

      Schubert MS. Fungal rhinosinusitis: diagnosis and therapy. Curr Allergy Asthma Rep 2001:1:268.

Att. D: ibid.

Att. E: https://www.mayoclinic.org/diseases-conditions/mold-allergy/symptoms-causes/ Syc-20351519.

Att. F: US Environmental Protection Agency (EPA). A brief guide to mold, moisture, and your Home. EPA 402-K-02-008, reprinted September 2012.

Att. G: Hardin BD, Kelman BJ, Saxon A. Adverse human health effects associated with molds in the indoor environment. J Occup Environ Med 2003; 45:470.

*look at Dates 05 to 08 Thru Notiny*

## OREGON DEPARTMENT OF CORRECTIONS
# Problem List

SS# *532 78 8483*  SSI *∅*

Health Insurance *∅*  Veteran *∅*

SAIF/WC *∅*  Open _____  Closed _____

| | Date Received | Date Paroled | Date Received | Date Paroled |
|---|---|---|---|---|
| | 7-26-05 24 mos. 3/11/08 PV | | 7/13/17 124 Months | |

| Date | Prob. No. | Problems | Date Resolved |
|---|---|---|---|
| 8/1/05 | 1 | Asthma hx / COPD | |
| ↓ | 2 | Hx migraines | |
| 03/08 | 3 | Health Maintenance | |
| 03/08 | 4 | Former smoker - Age onset ~13 → 3ppd | @ 15 |
| 03/08 | 5 | "IBS" per pt Hx. | |
| 03/08 | 6 | DJD / Hx @ Knee trauma. | |
| 03/08 | 7 | Mental Health Issues | |
| 03/08 | 8 | FHx DM / CVD | |
| 03/08 | 9 | Hx IV drug use | |



Eaton, Aaron
14997682

Immunizations:
Tetanus _____ 2004
MMR _____
Polio _____ Yes
Allergies/Sensitivies _____ NKDA

**EATON, AARON DALE**
14997682
9/10/76

CD 493 H (11/93)

EATON-PROD-0477

Eaton. Aaron (IM) SID#14997682 v. Evnon. et al.: 2:20-CV-1251-SI

## DECLARATION
( ORCP Rule 1E ) ( 28 USC § 1746 )

I, _Aaron Dale Eaton_ _____ AIC at TRCI, do declare that:

1. I am a first person witness over the age of 18 and am competent to give account of the facts reported within this declaration or I have actual first hand knowledge of the events that I am testifying to by giving this statement.

I got to prison This Time in 2017 upon my entry I was given medical exams and found to be healthy. My lungs, breathing was great. during the First couple of years 2017 till 2020 my breathing needed No inhaler to help. There are No Medication Administration Records giving me any type of breathing inhalers prior to 2-26-20 for this prison Sentence.

"I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE FOR USE AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY."

Dated this _9th_ day of _June_ _2021_, ~~AE~~

_Aaron Dale Eaton_
(Signature)
Print Name: _Aaron Dale EaTon_
S.I.D. No. _14997682_
82911 Beach Access Rd.
Umatilla, OR. 97882

PAGE  1 Of 1  DECLARATION

**EXHIBIT**

MEDICATION ADMINISTRATION RECORD

CD 488H (10-12)

| FACILITY NAME | MO. BEGI |  | PHARMACY NA. |  |  |
|---|---|---|---|---|---|
| **TRCI - TWO RIVERS** | **11/2020** |  | **PHY3 - SNAKE RIVER PHARMACY** |  |  |

| MEDICATION ORDERS | DAY OF MONTH |
|---|---|

| | HR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

.3126   ALBUTEROL HFA (GEN VENTOLIN) 90MCG (#200) INHO

SHAKE WELL AND INHALE TWO PUFFS DEEP INTO THE LUNGS 4 TIMES DAILY IF NEEDED (MUST LAST 120 DAYS) - OK IN CELL

ORG 8/4/2020   D/C 12/1/2020

1477853   CAPZASIN-HP^~(CAPSAICIN) 0.1% (42.5G) CRM

APPLY ONCE DAILY - OK IN CELL

ORG 12/9/2019   D/C 12/2/2020

1539270   FLUTICASONE/SALM*(WIXELA) #60 100/50MCG INHPO

INHALE ONE DOSE TWICE DAILY BY MOUTH - RINSE MOUTH AFTER USE - OK IN CELL

ORG 10/28/2020   D/C 10/22/2021

| The following symbols will be used to indicate medication administration practices | |
|---|---|
| • Initials —————— Dose was administered as ordered | • X —————— Comment charted in progress note |
| • Diagonal Line —— No dose is scheduled | • Blank —————— No show |
| • Circled Initials —— Dose was prepared but patient refused | • Circled R —————— Patient refused |
| | • nm —————— No Medication available |

| ALLERGIES | Drug Regimen Reviewed For Federal Requirements         R.Ph. | DATE ADMITTED    /    / |
|---|---|---|
| **NO KNOWN DRUG ALLERGY** | ROOM NUMBER | PATIENT NAME |
| | **02-07A**        **14997682** | **EATON, AARON DALE** |

EATON-PROD-0604

| Stamp | Initials | Signature | Staff Name |
|-------|----------|-----------|------------|
| Amos DMD | KA | K. Amos | Amos, K. DDS |
| | SA | C. Ahyat RN | Ah yat, S. RN |
| Bradshaw | DB | D Berg RN | Berg, D. RN |
| | EB | E Bradshaw | Bradshaw, E RN |
| RN | AB | A Brandon | Brandon, A. RN |
| | CB | C Brosnan | Brosnan, C. CPHT |
| | CC | C Campos RN | Campos, C. RN |
| | HC | H. Coleman RN | Coleman, H. RN |
| | WC | W. Craig, RN | Craig, W. RN |
| Dieter C | CD | Chitra Dram | Dieter, C. RN |
| Faulsti FIN RN | J. | faulstich R | Faulstich, J. RN |
| | DG | David Garin | Garin, D. RN |
| Garrett B RN | B | B Garrett RN | Garrett, B. RN |
| | CG | C Guttmann RN | Gettmann, C. RN |
| Gordanier RN | Dor | D Modanier RN | Gordanier, D. RN |
| Hays RN | MH | M Hays | Hays, M. CPHT |
| Hazen RN | TH | TH RN | Hazen, T. RN |
| Helfer PHARM TECH | AH | A Helfer | Helfer, A. CPHT |
| Henderson RN | AH | Henderson | Henderson, A. RN |
| Jergens RN | Sg | S Jemmett, RN | Jemmett, S. RN |
| | JJ | J Jergens, RN | Jergens, J. RN |
| Johnston RN | SJ | S Johnston, RN | Johnston, S. RN |

| DATE | RX # | MEDICATION/ DOSE | |
|------|------|------------------|--|
| | | | |
| | | | |
| | | | |

| Stamp | Initials | Signature | Staff Name |
|-------|----------|-----------|------------|
| | JK | J Kohler | Kohler, J. RN |
| | EB | E Bevers CMA | Bevers, E. CMA |
| | AB | A Bohn | Bohn, A. CMA |
| | CL | Cynthia Le Cloux NH | LeCloux, C. NH |
| Maney NP | PM | P. Maney NP | Maney, P. NP |
| | MM | M Mendoza RN | Mendoza, M. RN |
| Ortiz RN | JO | J Ortiz | Ortiz, J. RN |
| Palmer RN | TP | T Palmer | Palmer, T. RN |
| Peterson RN | JP | J Peterson RN | Peterson, J. RN |
| Peterson FNK | PP | P Peterson RN | Peterson, P. RN |
| | JQ | J Quick RN | Quick, J. RN |
| Rhodes RN | SR | S Rhodes RN | Rhodes, M. RN |
| Scott RN | CS | C Scott | Scott, C. RN |
| Shelton DMD | C S | C Shelton | Shelton, C. DMD |
| | CT | C Thurmond | Thurmond, C. RN |
| Vlahos RN | MV | M Vlahos | Vlahos, M. RN |
| Walker RN | SW | S Walker RN | Walker, S. RN |
| RN | NW | N Walsborn | Walsborn, N |
| Zavala Out | BZ | B Zavala | Zavala, B. RN |
| | BZ | B Zeller | Zeller, B. CPHT |
| | BW | B Wyfells | Wyfells, B. CMA |
| | NL | N Lathrop | Lathrop, N. RN |
| | | K Schwartz | Schwartz, K. CMA |
| | | A Vyhnal | Vyhnal, A. CMA |

**PRN**

| STAMP | DATE | TIME | MEDICATION | STAFF SIGNATURE | STAMP | DATE | TIME | MEDICATION | STAFF SIGNATURE |
|-------|------|------|------------|-----------------|-------|------|------|------------|-----------------|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

(Note Signatures updated 9/17/20 – TRCI Medical Services)

EATON-PROD-0605

Eaton, Aaron (IM) SID#14997682 v. Fynan, et al.; 2:20-CV-1251-SI



## OREGON DEPARTMENT OF CORRECTIONS

## AIC COMMUNICATION FORM

TO: _Provider Maney_ Date: _12-25-2020_

State your issue in detail: _I've been on the lung steriod called Fluticasone for about 60 days and it has not help my breathing. I believe the exposure to the Molds in The housing unit showers for the past 3 year have caused futher indurry to my Respitrary Track System._

| AIC Committed Name (first middle last) | | SID# | Housing Unit |
|---|---|---|---|
| Aaron    Dale    Eaton | | 14997682 | 2 |

Response/Action Taken: _Medical has never been informed that there is mold in the institution. I will forward your concern to physical plant_

Date Received: _____    Referred To*: _____

Date Answered: _12-26-20_    Signature of Staff Member: _CAhYaten_

'If forwarded, please notify the AIC

CD 214 (02/2020)

**DECLARATION**
(ORCP Rule 1E)

I, _Aaron Dale Eaton_ , do declare that:

Dr Gulick Just started the process of
diagnosing exposure to mold with an
order of imagery of lungs which has
been done waiting on results

"I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST OF MY

KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE FOR USE AS

EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY."

Dated this _9th_ day of _March_ , 20 _22_

_(Signature)_

Print Name: _Aaron Dale Eaton_
S.I.D. No. _14987682_

Page 1 of 1–Declaration                    Form 04.015

# NON-EMERGENCY HEALTH CARE REQUEST

Aaron  Dale  Eaton       14997682         5-6-21           6-11-21
Name                      State ID#         Housing          Date

**Medications:**
☐ I have not received my prescription
☐ My prescription is about to expire
☐ My prescription is not helping

**Glasses**
☐ Eye exam for glasses
☐ Repair

**Vaccines**
☐ Hepatitis A/B
☐ Flu
☐ Pneumonia
☐ Shingles
☐ HIV Test
☐ Hepatitis C Test

**Other Function**
☐ BP check
☐ Test result request
☐ Is my appointment still scheduled?
☒ Other issues – not sick:
_____
_____

Health Care request, issue, concern, or sickness:

I would like a blood test for Mold Toxicity Levels
please

We have taken the following actions in response to your health service request:

☐ You will be scheduled to see: ○ Provider      ○ Nursing staff

☐ Your request has been forwarded to: ○ Manager     ○ Optometry   ○ Support Services   ○ BHS
                                       ○ Pharmacy Technician ○ See attached health education handout

Additional Comments:  We do not test for mold

Responder's Signature: _____  Date: 6/12/21

# DECLARATION
( ORCP Rule 1E ) ( 28 USC § 1746 )
**(WHISTLE BLOWER DECLARATION PLEASE PROTECT IDENTITY)**

I, Robert Jerome Byers. _____ **(PLEASE PROTECT IDENTITY)**
AIC at TRCI, do declare that:

I am a first person witness over the age of 18 and am competent to give account of the facts reported within this declaration or I have actual first hand knowledge of the events that I am testifying to by giving this statement and I am under no form of duress and make this declaration on my own free will.

I was on the phone with a pulmonologist and provider Maney was listening. The pulmonologist had my lung exrays in front of her she said, "Mr. Byers I've got your lung exrays here, I've got a question for you, have you been exposed to enviromental molds?" I said yes, I could here provider Maney take a deep breath and wisper to some one. I continued to explain that the showers were just completly stripped due to Mildew, molds growing and continuing to come back even after chemicals were used to clean the substance.
The pulmonologist then started speaking to provider Maney about prescriptions I'll need to be on and she wanted to see me in person, due to the "exposure".

"I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE FOR USE AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY."

Dated this 22nd day of June, 2021 ~~2020~~.
R.J.B

_____ (Signature)
Print Name: Robert J. Byers.
S.I.D. No. 10311965
82911 Beach Access Rd.
Umatilla, OR. 97882

PAGE 1 Of 1 DECLARATION.

# WELCOME TO...

### Health Hazards in Construction

*Construction workers are exposed to a variety of health hazards every day. These men and women have the potential for becoming sick, ill and disabled for life.*

*Learn the health hazards on your job and know how to protect yourself...*

*Sadly, these health hazards (e.g., dangerous dust and other chemicals) can be unexpectedly brought home...*



*Learn how to protect your family!*

This publication contains:

1. The purpose for the Occupational Safety and Health Administration (OSHA) and its enforcement duty under law.
2. Common health hazards found in construction.
3. An explanation of Industrial Hygiene and toxicology.
4. Important terms and definitions used in health standards and toxicology.
5. Procedures for how to anticipate, recognize, evaluate and control health hazards in construction.
6. Hazard communication program for contractors & the Globally Harmonized System for Hazard Communication.
7. Respiratory protection program for contractors.
8. Hearing conservation program for contractors.

This program is dedicated to all the workers who have sustained a life threatening or disabling illness as a result of an occupational exposure.

## Acknowledgements & Credits

This publication was produced by:

**Construction Safety Council**
**4100 Madison Street**
**Hillside, IL  60162**
**(800) 552-7744        www.buildsafe.org**

**Copyright © 2012**

The Construction Safety Council will like to thank the following for their contributions and support:

➢ The Occupational Safety and Health Administration (OSHA)

➢ The National Institute for Occupational Safety and Health (NIOSH)

➢ The United States Environmental Protection Agency (EPA)

➢ Chicago Area Laborers – Employer Cooperation and Education Trust (LECET)

➢ United Union of Roofers, Waterproofers and Allied Workers

➢ elcoshimages.org

➢ LeBlanc Building Co., Inc.

➢ Milton R. Chicas

➢ David Allie (4-Safety.com)

➢ John Dimos, MS, CIH

GENERAL DISCLAIMER

This material is intended for training purposes only. Its purpose is to inform employers and employees of best practices in construction safety & health. This material is not a substitute for any provision of the Occupational Safety and Health Administration (OSHA) or any standards issued by OSHA. If at any time it is discovered that the materials presented vary from Federal or State OSHA regulations, American National Standards Institute (ANSI), EPA regulations, state laws or local ordinances, it is understood that those regulations, laws and ordinances will take precedence over the materials presented herein. In some cases, the information given may imply a higher level of protection then required in some Federal or State OSHA regulations. The mention of any products or materials by brand name in no way constitutes endorsement. Any products or materials not mentioned within this manual that may be considered acceptable as protective devices, equipment, or practices is not intentional and should not rule out their acceptability as employee or environmental protection.

OSHA DISCLAIMER

This material was produced under grant number SH-19495-09-60-F-17 from the Occupational Safety and Health Administration, U.S. Department of Labor. It does not necessarily reflect the views or policies of the U.S. Department of Labor, nor does mention of trade names, commercial products, or organizations imply endorsement by the U.S. Government.

Page

Introduction to Industrial Hygiene ..................................................................... 1

Anticipation of Health Hazards ......................................................................... 3

Recognition of Health Hazards ......................................................................... 4

Evaluation of Health Hazards ........................................................................... 7

Control of Health Hazards ............................................................................... 12

Job Hazard Analysis ....................................................................................... 13

Use of Professionals & Consultants ............................................................... 15

Introduction to OSHA ..................................................................................... 17

Workers' Rights under OSHA Law .................................................................. 20

Health Standards in Construction – Overview ................................................. 23

OSHA Permissible Exposure Limit (PEL) ...................................................... 28

ACGIH - Threshold Limit Value (TLV) ® ........................................................ 29

NIOSH Recommended Exposure Limit (REL) ................................................ 30

Hierarchy of Controls ..................................................................................... 32

Limitations & Use of Respirators .................................................................... 43

Respirator Types ............................................................................................ 44

Respirator Assigned Protection Factors ......................................................... 45

Respiratory Protection Decision Flow Chart ................................................... 46

OSHA Emphasis Programs (Health Standards) ............................................. 47

Competent Person & Training ......................................................................... 49

Health Hazards in Construction – Overview .................................................... 59

Health Effects and the Human Body ............................................................... 61

Acute Health Effects ...................................................................................... 62

Chronic Health Effects ................................................................................... 63

Local Health Effects ....................................................................................... 64

Systemic Health Effects ................................................................................. 65

Immediately Dangerous to Life & Health (IDLH) ............................................ 66

Confined & Enclosed Spaces ......................................................................... 67

Hazardous Atmospheres ................................................................................ 69

Flammable & Explosive Hazards .................................................................... 71

National Fire Protection Association (NFPA 704M) ........................................ 75

Globally Harmonized System of Classification & Labeling ............................. 76

Compressed Gas Cylinders ............................................................................ 82

Toxic vs. Flammable Environments ................................................................ 85

Table of Contents

Page

Oxygen Deficiency Hazards ........................................................... 86
Chemical Hazards in Construction ................................................ 88
Chemical Hazards in Construction – Gases ................................. 96
Breathable Air .............................................................................. 98
Simple Asphyxiants ..................................................................... 99
Temporary Heating Devices & Asphyxiation .............................. 102
Chemical Asphyxiants ............................................................... 103
Welding, Cutting & Brazing Gases ............................................ 106
Diesel Exhaust .......................................................................... 108
Respiratory Protection for Exposure to Gases .......................... 109
Chemical Hazards in Construction – Vapors ............................. 110
Respiratory Protection for Exposure to Vapors ......................... 113
Solvents Commonly Used in Construction ................................. 114
Chemical Hazards in Construction – Fumes .............................. 117
Asphalt Fumes .......................................................................... 120
Naphtha (Coal Tar) ................................................................... 121
Lead Fumes .............................................................................. 122
Hexavalent Chromium ............................................................... 123
Respiratory Protection for Exposure to Fumes .......................... 124
Chemical Hazards in Construction – Dusts & Fibers ................. 125
Crystalline Silica & Silicosis ...................................................... 127
Asbestos ................................................................................... 131
Metal Dusts & Lead-Based Paint .............................................. 135
Fiberglass Insulation ................................................................. 136
Respiratory Protection for Exposure to Dusts & Fibers ............. 137
Chemical Hazards in Construction – Mists ................................ 138
Respiratory Protection for Exposure to Mists ............................ 139
Chemical Health Hazards Categories Summary Chart .............. 140
Reproductive Toxins ................................................................. 141
Target Organ Effects ................................................................. 142
Synergistic Effect ...................................................................... 143
Chemical Hazard Communication – *Your Right to Know* .......... 144
Safety Data Sheet ..................................................................... 145
Container Labeling Requirements .............................................. 147

Table of Contents

| | Page |
|---|---|
| Model Hazard Communication Program | 149 |
| Physical Health Hazards in Construction | 157 |
| Temperature (Heat) | 158 |
| Temperature (Cold) | 161 |
| Occupational Noise | 164 |
| Hearing Conservation Program | 170 |
| Noise Reduction Rating (NRR) for Hearing Protectors | 171 |
| Noise Reduction Rating (NRR) Adjustment Calculation | 172 |
| Dual Hearing Protection | 173 |
| Repetitive Motion, Awkward Posture & Vibration | 174 |
| Pre-Work Stretch & Flex | 178 |
| Ionizing Radiation | 180 |
| Non-Ionizing Radiation | 183 |
| Biological Health Hazards in Construction | 189 |
| Fungi (Mold) | 190 |
| Histoplasmosis & Hantavirus | 192 |
| Respiratory Protection for Exposure to Fungi (Mold) | 193 |
| Bloodborne Pathogens | 194 |
| Poisonous Plants | 197 |
| Poisonous & Infectious Animals | 198 |
| Special Considerations for Construction | 201 |
| Chemical Glove Selection Chart | 203 |
| Respiratory Protection Program for Contractors | 207 |
| Respiratory Cleaning & Maintenance | 219 |
| Job Hazard Analysis Worksheet | 220 |
| Sample Confined Space Permit | 221 |
| OSHA Enforcement Policy – Respiratory Hazards Not Covered by OSHA | 223 |
| 29 CFR 1926.55 Appendix A – ACGIH TLVs ® (1970) | 225 |
| Health Hazards Resources | 231 |
| Glossary | 232 |

Biological Health Hazards in Construction

# BIOLOGICAL HEALTH HAZARDS

**Learning Goals:**

➢ Be able to explain what a biological health hazard is and how construction workers might be exposed to these hazards.

➢ Define important terms used to describe biological hazards in the workplace.

➢ Overview the health effects of these hazards on the human body.

**Important Terms:**

☐ Fungi (mold)

☐ Histoplasmosis

☐ Hantavirus

☐ Blood Borne Pathogens

☐ Universal Precautions

☐ HIV

☐ Hepatitis – HBV & HCV

☐ Rabies

## Biological Health Hazards

Biological agents include bacteria, viruses, fungi (mold), other microorganisms and their associated toxins. They have the ability to adversely affect human health in a variety of ways, ranging from relatively mild, allergic reactions to serious medical conditions, even death. These organisms are widespread in the natural environment; they are found in air, water, soil, plants, and animals. Because many microbes reproduce rapidly and require minimal resources for survival, they are a potential danger in a wide variety of occupational settings. 

*In the construction industry, biological health hazards are most commonly found:*

➢ When working in health care facilities.

➢ Where there has been an accumulation of animal waste and the presence of rodents, insects and birds.

➢ During demolition and remodeling of old structures and buildings where there is likely the presence of mold.

➢ During clearing operations and the removal of plants, trees and other foliage.

➢ Landscaping.



*Biological Hazards Example...*
*Flood damaged structure – preparing*
*for demolition; mold invested building*
*and potential harborage of rodents,*
*insects and other vermin.* 

Fungi (Mold)

# Fungi (Mold)

Fungi (mold) are found everywhere – both indoors and outdoors all year round. The terms fungi and mold are often used interchangeably, but mold is actually a type of fungi. There are many thousands of species of mold and most if not all of the mold found indoors comes from outdoor sources. Mold seems likely to grow and become a problem only when there is water damage, high humidity, or dampness. *showers with Grout Tile*

Molds are organized into three groups according to human responses: ***Allergenic, Pathogenic*** and ***Toxigenic.***

## Allergenic Molds 

Allergenic molds do not usually produce life-threatening health effects and are most likely to affect those who are already allergic or asthmatic. The human system responses to allergenic molds tend to be relatively mild, depending on individual sensitivities, typically producing scratchy throats, eye and nose irritations and rashes.

## Pathogenic Molds

Pathogenic molds usually produce some type of infection. They can cause serious health effects in persons with suppressed immune systems. Healthy people can usually resist infection by these organisms regardless of dose. In some cases, high exposure may cause hypersensitivity pneumonitis (an acute response to exposure to an organism).

## Toxigenic Molds 

Mycotoxins can cause serious health effects in almost anybody. These agents have toxic effects ranging from short-term irritation to immuno-suppression and possibly cancer. Therefore, when toxigenic molds are found further evaluation is recommended.

## How do Molds Affect the Body?

Molds produce and release millions of spores small enough to be airborne. They can also produce toxic agents known as mycotoxins. Spores and mycotoxins can have negative effects on human health.

The most common route of entry into the body is through inhalation; mold has a characteristic smell – if you smell mold, you could be inhaling mold.

Mold is generally visible; however, some of the most toxic mold spores are small enough to be considered respirable [less than 10 micrometers (10 μm) in diameter]. *Not always*



Mold

Visible

10 μm        100 μm

Fungi (Mold)

## *Ten Things You Should Know About Mold*

 1. Potential health effects and symptoms associated with mold exposures include allergic reactions, asthma, and other respiratory complaints.

2. There is no practical way to eliminate all molds and mold spores in the indoor environment; the way to control indoor mold growth is to control moisture.

3. If mold is a problem in your workplace, you must clean up the mold and eliminate sources of moisture.

4. Fix the source of the water problem or leak to prevent mold growth.

5. Reduce indoor humidity (to 30-60%) to decrease mold growth.

6. Clean and dry any damp or wet building materials and furnishings to prevent mold growth.

7. Clean mold off hard surfaces with water and detergent, and dry completely.

8. Absorbent materials such as ceiling tiles, that are moldy, may need to be replaced.

9. Prevent condensation on cold surfaces by adding insulation.

10. In areas where there is a perpetual moisture problem, do not install carpeting.

---

**Remember... molds can be found almost anywhere; they can grow on virtually any substance, providing moisture is present.**

---

### Basic Mold Cleanup

> Make sure the working area is well ventilated.

> Place mold damaged materials in a plastic bag and discard.

> Clean mold off hard surfaces and other nonporous materials with detergent and water, and dry completely.

> Disinfect these cleaned surfaces with one of the following household bleach solutions: 1/4 cup household bleach per 1 gallon of clean water for light contamination, 1 ½ cups household bleach per 1 gallon of clean water for heavy contamination.



**Worker exposed to fungi (mold) – wearing personal protective equipment.**

Histoplasmosis & Hantavirus

# Histoplasmosis

Histoplasmosis is an infectious disease caused by inhaling the spores of a fungus called *Histoplasma capsulatum (H. capsulatum)*. Histoplasmosis is not contagious; it cannot be transmitted from an infected person or animal to someone else.

*H. capsulatum* is a dimorphic fungus, which means it has two forms. It is a mold in soil at ambient temperatures, and after being inhaled by humans or animals, it produces a yeast phase when spores undergo genetic, biochemical, and physical alterations. Spores of *H. capsulatum* are oval and have two sizes. Macroconidia (large spores) have diameters ranging from 8 to 15 micrometers (μm), and microconidia (small spores) range from 2 to 5 μm in diameter. Yeast cells of *H. capsulatum* have oval to round shapes and diameters ranging from 1 to 5 μm.

Histoplasmosis primarily affects a person's lungs, and its symptoms vary greatly. The vast majority of infected people are asymptomatic (have no apparent ill effects), or they experience symptoms so mild they do not seek medical attention and may not even realize that their illness was Histoplasmosis. If symptoms do occur, they will usually start within 3 to 17 days after exposure, with an average of 10 days. Histoplasmosis can appear as a mild, flu-like respiratory illness and has a combination of symptoms, including malaise (a general ill feeling), fever, chest pain, dry or nonproductive cough, headache, loss of appetite, shortness of breath, joint and muscle pains, chills, and hoarseness.

*Source:*
*NIOSH Publication*
*Histoplasmosis – Protecting Workers at Risk*

### Where are H. capsulatum spores found?

*H. capsulatum* grows in soils throughout the world. In the United States, the fungus is endemic and the proportion of people infected by *H. capsulatum* is higher in central and eastern states, especially along the Ohio and Mississippi River valleys. The fungus seems to grow best in soils having high nitrogen content, especially those enriched with bird manure or bat droppings.



Construction workers who work in areas where there is the accumulation of bird and/or bat droppings must be protected against the harmful effects of *H. capsulatum*.

# Hantavirus Pulmonary Syndrome

Hantavirus is a disease spread by rodents that is similar to the flu. The virus is in their urine and feces, but it does not make the carrier animal sick. Humans are thought to become infected when they are exposed to contaminated dust from mice nests or droppings.



The disease is not passed between humans. People may encounter contaminated dust when cleaning long-empty homes, sheds, or other enclosed areas.

Respiratory Protection for Exposure to Fungi (Mold)

# Respiratory Protection for Exposures to Fungi (Mold)

Respiratory protection for exposure to fungi (mold) will depend on the size of the particle and its level of toxicity. Whenever you smell or see the presence of mold, it is important to take precautions to LIMIT YOUR EXPOSURE to mold and mold spores.

### Avoid breathing in mold or mold spores!

In order to limit your exposure to airborne mold, wear at a minimum an N-95 respirator; for higher level of protection use a 99 or 100 (HEPA) rated filter. If oil is present in the air then make sure to use either an R or a P designated filter.

*Respiratory protection for exposure to fungi (mold)…*



**Approved Filtering Facepiece Respirator (Disposable) – any combination of N, R & P with efficiency 95, 99 or 100.**



**Half Mask, Elastomeric, Air Purifying Respirator – any combination of N, R & P with efficiency 95, 99 or 100.**

# NIOSH Recommendation for Mold

The NIOSH minimum recommendation for respiratory protection for workers remediating dusty areas contaminated with highly infectious Histoplasma capsulatum spores (from bird and bat manure) is a full-facepiece respirator (APF 50).



**Full Facepiece, Elastomeric, Air Purifying Respirator – any combination of N, R & P with efficiency 95, 99 or 100.**

# DECLARATION
( ORCP Rule 1E ) ( 28 USC § 1746 )
**(WHISTLE BLOWER DECLARATION PLEASE PROTECT IDENTITY)**

I, Aaron Dale Eaton _____ **(PLEASE PROTECT IDENTITY)**
AIC at TRCI, do declare that:

I am a first person witness over the age of 18 and am competent to give account of the facts reported within this declaration or I have actual first hand knowledge of the events that I am testifying to by giving this statement and I am under no form of duress and make this declaration on my own free will. "OSHA Not followed" added 3-9-22 DE

The Showers in unit "a" are so bad, causing multiple inmates to complain, TRCI finally started removing the Tiles (I saw the mold and mildew in the grout and behind the Tiles) and would not issue the cells that were right next to the demolition of the Showers any type of mask, fact the physical plant workers (inmate) got to wear masks but No type of P.P.E was issued to us and we were forced to breath in the particals in the air that came from the Tile removal of the showers, I had to use my abuteral as prescribed 2 puffs 4 times each day that physical plant worked on the removal of the Tiles. Then when my abuteral inhaler prescription ran out I was forced to get a newish inhaler from another inmate because medical refused to give me a New inhaler stating that the inhaler was to last me.

"I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE FOR USE AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY."

Dated this 19th day of June, 2021 , ~~2020.~~

_Aaron Dale Eaton_
(Signature)
Print Name: Aaron Dale Eaton .
S.I.D. No. 14497682 .
82911 Beach Access Rd.
Umatilla, OR. 97882

PAGE 1 Of 2 DECLARATION

**Billing Code: 4410-1**

# Part 35 Nondiscrimination on the Basis of Disability in State and Local Government Services (as amended by the final rule published on September 15, 2010)

## Authority: 5 U.S.C. 301; 28 U.S.C. 509, 510; 42 U.S.C. 12134.

## Subpart A—General

### § 35.101 Purpose.

The purpose of this part is to effectuate subtitle A of title II of the Americans with Disabilities Act of 1990 (42 U.S.C. 12131), which prohibits discrimination on the basis of disability by public entities.

### § 35.102 Application.

(a) Except as provided in paragraph (b) of this section, this part applies to all services, programs, and activities provided or made available by public entities.

(b) To the extent that public transportation services, programs, and activities of public entities are covered by subtitle B of title II of the ADA, they are not subject to the requirements of this part.

### § 35.103 Relationship to other laws.

(a) *Rule of interpretation.* Except as otherwise provided in this part, this part shall not be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 or the regulations issued by Federal agencies pursuant to that title.

(b) *Other laws.* This part does not invalidate or limit the remedies, rights, and procedures of any other Federal laws, or State or local laws (including State common law) that provide greater or equal protection for the rights of individuals with disabilities or individuals associated with them.

### § 35.104 Definitions.

For purposes of this part, the term—

*1991 Standards* **means the requirements set forth in the ADA Standards for Accessible Design, originally published on July 26, 1991, and republished as Appendix D to 28 CFR part 36.**

*2004 ADAAG* **means the requirements set forth in appendices B and D to 36 CFR part 1191 (2009).**

*2010 Standards* **means the 2010 ADA Standards for Accessible Design, which consist of the 2004 ADAAG and the requirements contained in § 35.151.**

*Act* means the Americans with Disabilities Act (Pub. L. 101-336, 104 Stat. 327, 42 U.S.C. 12101-12213 and 47 U.S.C. 225 and 611).

*Assistant Attorney General* means the Assistant Attorney General, Civil Rights Division, United States Department of Justice.

*Auxiliary aids and services* includes—

**(1) Qualified interpreters on-site or through video remote interpreting (VRI) services; notetakers; real-time computer-aided transcription services; written materials; exchange of written notes; telephone handset amplifiers; assistive listening devices; assistive listening systems; telephones compatible with hearing aids; closed caption decoders; open and closed captioning, including real-time captioning; voice, text, and video-based telecommunications products and systems, including text telephones (TTYs), videophones, and captioned telephones, or equally effective telecommunications devices; videotext displays; accessible**

electronic and information technology; or other effective methods of making aurally delivered information available to individuals who are deaf or hard of hearing;

**(2) Qualified readers; taped texts; audio recordings; Brailled materials and displays; screen reader software; magnification software; optical readers; secondary auditory programs (SAP); large print materials; accessible electronic and information technology; or other effective methods of making visually delivered materials available to individuals who are blind or have low vision;**

(3) Acquisition or modification of equipment or devices; and

(4) Other similar services and actions.

*Complete complaint* means a written statement that contains the complainant's name and address and describes the public entity's alleged discriminatory action in sufficient detail to inform the agency of the nature and date of the alleged violation of this part. It shall be signed by the complainant or by someone authorized to do so on his or her behalf. Complaints filed on behalf of classes or third parties shall describe or identify (by name, if possible) the alleged victims of discrimination.

*Current illegal use of drugs* means illegal use of drugs that occurred recently enough to justify a reasonable belief that a person's drug use is current or that continuing use is a real and ongoing problem.

*Designated agency* means the Federal agency designated under subpart G of this part to oversee compliance activities under this part for particular components of State and local governments.

**Direct threat means a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices or procedures, or by the provision of auxiliary aids or services as provided in § 35.139.**

*Disability* means, with respect to an individual, a physical or mental impairment that substantially limits one or more of the major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment.

(1)

(i) The phrase *physical or mental impairment* means—

(A) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine;

(B) Any mental or psychological disorder such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

(ii) The phrase *physical or mental impairment* includes, but is not limited to, such contagious and noncontagious diseases and conditions as orthopedic, visual, speech and hearing impairments, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, mental retardation, emotional illness, specific learning disabilities, HIV disease (whether symptomatic or asymptomatic), tuberculosis, drug addiction, and alcoholism.

(iii) The phrase *physical or mental impairment* does not include homosexuality or bisexuality.

(2) The phrase *major life activities* means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

(3) The phrase *has a record of such an impairment* means has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.

(4) The phrase *is regarded as having an impairment* means—

(i) Has a physical or mental impairment that does not substantially limit major life activities but that is treated by a public entity as constituting such a limitation;

(ii) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

(iii) Has none of the impairments defined in paragraph (1) of this definition but is treated by a public entity as having such an impairment.

(5) The term *disability* does not include—

(i) Transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, gender identity disorders not resulting from physical impairments, or other sexual behavior disorders;

(ii) Compulsive gambling, kleptomania, or pyromania; or

(iii) Psychoactive substance use disorders resulting from current illegal use of drugs.

*Drug* means a controlled substance, as defined in schedules I through V of section 202 of the Controlled Substances Act (21 U.S.C. 812).

***Existing facility*** **means a facility in existence on any given date, without regard to whether the facility may also be considered newly constructed or altered under this part.**

*Facility* means all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located.

*Historic preservation programs* means programs conducted by a public entity that have preservation of historic properties as a primary purpose.

*Historic properties* means those properties that are listed or eligible for listing in the National Register of Historic Places or properties designated as historic under State or local law.

***Housing at a place of education*** **means housing operated by or on behalf of an elementary, secondary, undergraduate, or postgraduate school, or other place of education, including dormitories, suites, apartments, or other places of residence.**

*Illegal use of drugs* means the use of one or more drugs, the possession or distribution of which is unlawful under the Controlled Substances Act (21 U.S.C. 812). The term illegal use of drugs does not include the use of a drug taken under supervision by a licensed health care professional, or other uses authorized by the Controlled Substances Act or other provisions of Federal law.

*Individual with a disability* means a person who has a disability. The term individual with a disability does not include an individual who is currently engaging in the illegal use of drugs, when the public entity acts on the basis of such use.

*Other power-driven mobility device* means any mobility device powered by batteries, fuel, or other engines—whether or not designed primarily for use by individuals with mobility disabilities—that is used by individuals with mobility disabilities for the purpose of locomotion, including golf cars, electronic personal assistance mobility devices (EPAMDs), such as the Segway® PT, or any mobility device designed to operate in areas without defined pedestrian routes, but that is not a wheelchair within the meaning of this section. This definition does not apply to Federal wilderness areas; wheelchairs in such areas are defined in section 508(c)(2) of the ADA, 42 U.S.C. 12207(c)(2).

*Public entity* means—

(1) Any State or local government;

(2) Any department, agency, special purpose district, or other instrumentality of a State or States or local government; and

(3) The National Railroad Passenger Corporation, and any commuter authority (as defined in section 103(8) of the Rail Passenger Service Act).

*Qualified individual with a disability* means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers,

or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

*Qualified interpreter* **means an interpreter who, via a video remote interpreting (VRI) service or an on-site appearance, is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary. Qualified interpreters include, for example, sign language interpreters, oral transliterators, and cued-language transliterators.**

*Qualified reader* **means a person who is able to read effectively, accurately, and impartially using any necessary specialized vocabulary.**

*Section 504* means section 504 of the Rehabilitation Act of 1973 (Pub. L. 93-112, 87 Stat. 394 (29 U.S.C. 794), as amended.

*Service animal* **means any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability. Other species of animals, whether wild or domestic, trained or untrained, are not service animals for the purposes of this definition. The work or tasks performed by a service animal must be directly related to the individual's disability. Examples of work or tasks include, but are not limited to, assisting individuals who are blind or have low vision with navigation and other tasks, alerting individuals who are deaf or hard of hearing to the presence of people or sounds, providing non-violent protection or rescue work, pulling a wheelchair, assisting an individual during a seizure, alerting individuals to the presence of allergens, retrieving items such as medicine or the telephone, providing physical support and assistance with balance and stability to individuals with mobility disabilities, and helping persons with psychiatric and neurological disabilities by preventing or interrupting impulsive or destructive behaviors. The crime deterrent effects of an animal's presence and the provision of emotional support, well-being, comfort, or companionship do not constitute work or tasks for the purposes of this definition.**

*State* means each of the several States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the Virgin Islands, the Trust Territory of the Pacific Islands, and the Commonwealth of the Northern Mariana Islands.

*Video remote interpreting (VRI) service* **means an interpreting service that uses video conference technology over dedicated lines or wireless technology offering high-speed, wide-bandwidth video connection that delivers high-quality video images as provided in § 35.160(d).**

*Wheelchair* **means a manually-operated or power-driven device designed primarily for use by an individual with a mobility disability for the main purpose of indoor, or of both indoor and outdoor locomotion. This definition does not apply to Federal wilderness areas; wheelchairs in such areas are defined in section 508(c)(2) of the ADA, 42 U.S.C. 12207 (c)(2).**

## § 35.105 Self-evaluation.

(a) A public entity shall, within one year of the effective date of this part, evaluate its current services, policies, and practices, and the effects thereof, that do not or may not meet the requirements of this part and, to the extent modification of any such services, policies, and practices is required, the public entity shall proceed to make the necessary modifications.

(b) A public entity shall provide an opportunity to interested persons, including individuals with disabilities or organizations representing individuals with disabilities, to participate in the self-evaluation process by submitting comments.

(c) A public entity that employs 50 or more persons shall, for at least three years following completion of the self-evaluation, maintain on file and make available for public inspection:

    (1) A list of the interested persons consulted;

    (2) A description of areas examined and any problems identified; and

    (3) A description of any modifications made.

(d) If a public entity has already complied with the self-evaluation requirement of a regulation implementing section 504 of the Rehabilitation Act of 1973, then the requirements of this section shall apply only to those policies and practices that were not included in the previous self- evaluation.

## § 35.106 Notice

A public entity shall make available to applicants, participants, beneficiaries, and other interested persons information regarding the provisions of this part and its applicability to the services, programs, or activities of the public entity, and make such information available to them in such manner as the head of the entity finds necessary to apprise such persons of the protections against discrimination assured them by the Act and this part.

## § 35.107 Designation of responsible employee and adoption of grievance procedures

(a) *Designation of responsible employee.* A public entity that employs 50 or more persons shall designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under this part, including any investigation of any complaint communicated to it alleging its noncompliance with this part or alleging any actions that would be prohibited by this part. The public entity shall make available to all interested individuals the name, office address, and telephone number of the employee or employees designated pursuant to this paragraph.

(b) *Complaint procedure.* A public entity that employs 50 or more persons shall adopt and publish grievance procedures providing for prompt and equitable resolution of complaints alleging any action that would be prohibited by this part.

## §§ 35.108—35.129 [Reserved]

## Subpart B—General Requirements

## § 35.130 General prohibitions against discrimination

(a) No qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

(b)

    (1) A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

        (i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;

         (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

        (iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

        (iv) Provide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others;

        (v) Aid or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program;

        (vi) Deny a qualified individual with a disability the opportunity to participate as a member of planning or advisory boards;

(vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

(2) A public entity may not deny a qualified individual with a disability the opportunity to participate in services, programs, or activities that are not separate or different, despite the existence of permissibly separate or different programs or activities.

(3) A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration—

(i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;

(ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or

(iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State.

(4) A public entity may not, in determining the site or location of a facility, make selections—

(i) That have the effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination; or

(ii) That have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities.

(5) A public entity, in the selection of procurement contractors, may not use criteria that subject qualified individuals with disabilities to discrimination on the basis of disability.

(6) A public entity may not administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability, nor may a public entity establish requirements for the programs or activities of licensees or certified entities that subject qualified individuals with disabilities to discrimination on the basis of disability. The programs or activities of entities that are licensed or certified by a public entity are not, themselves, covered by this part.

(7) A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

(8) A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

(c) Nothing in this part prohibits a public entity from providing benefits, services, or advantages to individuals with disabilities, or to a particular class of individuals with disabilities beyond those required by this part.

(d) A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.

(e)

(1) Nothing in this part shall be construed to require an individual with a disability to accept an accommodation, aid, service, opportunity, or benefit provided under the ADA or this part which such individual chooses not to accept.

(2) Nothing in the Act or this part authorizes the representative or guardian of an individual with a disability to decline food, water, medical treatment, or medical services for that individual.

(f) A public entity may not place a surcharge on a particular individual with a disability or any group of individuals with disabilities to cover the costs of measures, such as the provision of auxiliary aids or program accessibility,

that are required to provide that individual or group with the nondiscriminatory treatment required by the Act or this part.

(g) A public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association.

**(h) A public entity may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities. However, the public entity must ensure that its safety requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities.**

## § 35.131 Illegal use of drugs

(a) *General.*

(1) Except as provided in paragraph (b) of this section, this part does not prohibit discrimination against an individual based on that individual's current illegal use of drugs.

(2) A public entity shall not discriminate on the basis of illegal use of drugs against an individual who is not engaging in current illegal use of drugs and who—

(i) Has successfully completed a supervised drug rehabilitation program or has otherwise been rehabilitated successfully;

(ii) Is participating in a supervised rehabilitation program; or

(iii) Is erroneously regarded as engaging in such use.

(b) *Health and drug rehabilitation services.*

(1) A public entity shall not deny health services, or services provided in connection with drug rehabilitation, to an individual on the basis of that individual's current illegal use of drugs, if the individual is otherwise entitled to such services.

(2) A drug rehabilitation or treatment program may deny participation to individuals who engage in illegal use of drugs while they are in the program.

(c) *Drug testing.*

(1) This part does not prohibit a public entity from adopting or administering reasonable policies or procedures, including but not limited to drug testing, designed to ensure that an individual who formerly engaged in the illegal use of drugs is not now engaging in current illegal use of drugs.

(2) Nothing in paragraph (c) of this section shall be construed to encourage, prohibit, restrict, or authorize the conduct of testing for the illegal use of drugs.

## § 35.132 Smoking

This part does not preclude the prohibition of, or the imposition of restrictions on, smoking in transportation covered by this part.

## § 35.133 Maintenance of accessible features

(a) A public entity shall maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities by the Act or this part.

(b) This section does not prohibit isolated or temporary interruptions in service or access due to maintenance or repairs.

**(c) If the 2010 Standards reduce the technical requirements or the number of required accessible elements below the number required by the 1991 Standards, the technical requirements or the number of**

**accessible elements in a facility subject to this part may be reduced in accordance with the requirements of the 2010 Standards.**

## § 35.134 Retaliation or coercion

(a) No private or public entity shall discriminate against any individual because that individual has opposed any act or practice made unlawful by this part, or because that individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the Act or this part.

(b) No private or public entity shall coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the Act or this part.

## § 35.135 Personal devices and services

This part does not require a public entity to provide to individuals with disabilities personal devices, such as wheelchairs; individually prescribed devices, such as prescription eyeglasses or hearing aids; readers for personal use or study; or services of a personal nature including assistance in eating, toileting, or dressing.

## § 35.136 Service animals

(a) *General.* **Generally, a public entity shall modify its policies, practices, or procedures to permit the use of a service animal by an individual with a disability.**

(b) *Exceptions.* **A public entity may ask an individual with a disability to remove a service animal from the premises if—**

    **(1) The animal is out of control and the animal's handler does not take effective action to control it; or**

    **(2) The animal is not housebroken.**

(c) *If an animal is properly excluded.* **If a public entity properly excludes a service animal under § 35.136(b), it shall give the individual with a disability the opportunity to participate in the service, program, or activity without having the service animal on the premises.**

(d) *Animal under handler's control.* **A service animal shall be under the control of its handler. A service animal shall have a harness, leash, or other tether, unless either the handler is unable because of a disability to use a harness, leash, or other tether, or the use of a harness, leash, or other tether would interfere with the service animal's safe, effective performance of work or tasks, in which case the service animal must be otherwise under the handler's control (*e.g.*, voice control, signals, or other effective means).**

(e) *Care or supervision.* **A public entity is not responsible for the care or supervision of a service animal.**

(f) *Inquiries.* **A public entity shall not ask about the nature or extent of a person's disability, but may make two inquiries to determine whether an animal qualifies as a service animal. A public entity may ask if the animal is required because of a disability and what work or task the animal has been trained to perform. A public entity shall not require documentation, such as proof that the animal has been certified, trained, or licensed as a service animal. Generally, a public entity may not make these inquiries about a service animal when it is readily apparent that an animal is trained to do work or perform tasks for an individual with a disability (*e.g.*, the dog is observed guiding an individual who is blind or has low vision, pulling a person's wheelchair, or providing assistance with stability or balance to an individual with an observable mobility disability).**

(g) *Access to areas of a public entity.* **Individuals with disabilities shall be permitted to be accompanied by their service animals in all areas of a public entity's facilities where members of the public, participants in services, programs or activities, or invitees, as relevant, are allowed to go.**

(h) *Surcharges.* A public entity shall not ask or require an individual with a disability to pay a surcharge, even if people accompanied by pets are required to pay fees, or to comply with other requirements generally not applicable to people without pets. If a public entity normally charges individuals for the damage they cause, an individual with a disability may be charged for damage caused by his or her service animal.

(i) *Miniature horses.*

    (1) *Reasonable modifications.* A public entity shall make reasonable modifications in policies, practices, or procedures to permit the use of a miniature horse by an individual with a disability if the miniature horse has been individually trained to do work or perform tasks for the benefit of the individual with a disability.

    (2) *Assessment factors.* In determining whether reasonable modifications in policies, practices, or procedures can be made to allow a miniature horse into a specific facility, a public entity shall consider—

        (i) The type, size, and weight of the miniature horse and whether the facility can accommodate these features;

        (ii) Whether the handler has sufficient control of the miniature horse;

        (iii) Whether the miniature horse is housebroken; and

        (iv) Whether the miniature horse's presence in a specific facility compromises legitimate safety requirements that are necessary for safe operation.

    (3) *Other requirements.* Paragraphs 35.136 (c) through (h) of this section, which apply to service animals, shall also apply to miniature horses.

## § 35.137 Mobility devices.

(a) *Use of wheelchairs and manually-powered mobility aids.* A public entity shall permit individuals with mobility disabilities to use wheelchairs and manually-powered mobility aids, such as walkers, crutches, canes, braces, or other similar devices designed for use by individuals with mobility disabilities in any areas open to pedestrian use.

(b)

    (1) *Use of other power-driven mobility devices.* A public entity shall make reasonable modifications in its policies, practices, or procedures to permit the use of other power-driven mobility devices by individuals with mobility disabilities, unless the public entity can demonstrate that the class of other power-driven mobility devices cannot be operated in accordance with legitimate safety requirements that the public entity has adopted pursuant to § 35.130(h).

    (2) *Assessment factors.* In determining whether a particular other power-driven mobility device can be allowed in a specific facility as a reasonable modification under paragraph (b)(1) of this section, a public entity shall consider—

        (i) The type, size, weight, dimensions, and speed of the device;

        (ii) The facility's volume of pedestrian traffic (which may vary at different times of the day, week, month, or year);

        (iii) The facility's design and operational characteristics (*e.g.*, whether its service, program, or activity is conducted indoors, its square footage, the density and placement of stationary devices, and the availability of storage for the device, if requested by the user);

        (iv) Whether legitimate safety requirements can be established to permit the safe operation of the other power-driven mobility device in the specific facility; and

        (v) Whether the use of the other power-driven mobility device creates a substantial risk of serious harm to the immediate environment or natural or cultural resources, or poses a

conflict with Federal land management laws and regulations.

(c)

(1) *Inquiry about disability.* A public entity shall not ask an individual using a wheelchair or other power-driven mobility device questions about the nature and extent of the individual's disability.

(2) *Inquiry into use of other power-driven mobility device.* A public entity may ask a person using an other power-driven mobility device to provide a credible assurance that the mobility device is required because of the person's disability. A public entity that permits the use of an other power-driven mobility device by an individual with a mobility disability shall accept the presentation of a valid, State-issued, disability parking placard or card, or other State-issued proof of disability as a credible assurance that the use of the other power-driven mobility device is for the individual's mobility disability. In lieu of a valid, State-issued disability parking placard or card, or State-issued proof of disability, a public entity shall accept as a credible assurance a verbal representation, not contradicted by observable fact, that the other power-driven mobility device is being used for a mobility disability. A "valid" disability placard or card is one that is presented by the individual to whom it was issued and is otherwise in compliance with the State of issuance's requirements for disability placards or cards.

## § 35.138 Ticketing

(a)

(1) For the purposes of this section, "accessible seating" is defined as wheelchair spaces and companion seats that comply with sections 221 and 802 of the 2010 Standards along with any other seats required to be offered for sale to the individual with a disability pursuant to paragraph (d) of this section.

(2) *Ticket sales.* A public entity that sells tickets for a single event or series of events shall modify its policies, practices, or procedures to ensure that individuals with disabilities have an equal opportunity to purchase tickets for accessible seating—

(i) During the same hours;

(ii) During the same stages of ticket sales, including, but not limited to, pre-sales, promotions, lotteries, wait-lists, and general sales;

(iii) Through the same methods of distribution;

(iv) In the same types and numbers of ticketing sales outlets, including telephone service, in-person ticket sales at the facility, or third-party ticketing services, as other patrons; and

(v) Under the same terms and conditions as other tickets sold for the same event or series of events.

(b) *Identification of available accessible seating.* A public entity that sells or distributes tickets for a single event or series of events shall, upon inquiry—

(1) Inform individuals with disabilities, their companions, and third parties purchasing tickets for accessible seating on behalf of individuals with disabilities of the locations of all unsold or otherwise available accessible seating for any ticketed event or events at the facility;

(2) Identify and describe the features of available accessible seating in enough detail to reasonably permit an individual with a disability to assess independently whether a given accessible seating location meets his or her accessibility needs; and

(3) Provide materials, such as seating maps, plans, brochures, pricing charts, or other information, that identify accessible seating and information relevant thereto with the same text or visual representations as other seats, if such materials are provided to the general public.

(c) *Ticket prices.* The price of tickets for accessible seating for a single event or series of events shall not be set higher than the price for other tickets in the same seating section for the same event or series of events. Tickets for accessible seating must be made available at all price levels for every event or series of

events. If tickets for accessible seating at a particular price level are not available because of inaccessible features, then the percentage of tickets for accessible seating that should have been available at that price level (determined by the ratio of the total number of tickets at that price level to the total number of tickets in the assembly area) shall be offered for purchase, at that price level, in a nearby or similar accessible location.

(d) *Purchasing multiple tickets.*

(1) *General.* For each ticket for a wheelchair space purchased by an individual with a disability or a third-party purchasing such a ticket at his or her request, a public entity shall make available for purchase three additional tickets for seats in the same row that are contiguous with the wheelchair space, provided that at the time of purchase there are three such seats available. A public entity is not required to provide more than three contiguous seats for each wheelchair space. Such seats may include wheelchair spaces.

(2) *Insufficient additional contiguous seats available.* If patrons are allowed to purchase at least four tickets, and there are fewer than three such additional contiguous seat tickets available for purchase, a public entity shall offer the next highest number of such seat tickets available for purchase and shall make up the difference by offering tickets for sale for seats that are as close as possible to the accessible seats.

(3) *Sales limited to less than four tickets.* If a public entity limits sales of tickets to fewer than four seats per patron, then the public entity is only obligated to offer as many seats to patrons with disabilities, including the ticket for the wheelchair space, as it would offer to patrons without disabilities.

(4) *Maximum number of tickets patrons may purchase exceeds four.* If patrons are allowed to purchase more than four tickets, a public entity shall allow patrons with disabilities to purchase up to the same number of tickets, including the ticket for the wheelchair space.

(5) *Group sales.* If a group includes one or more individuals who need to use accessible seating because of a mobility disability or because their disability requires the use of the accessible features that are provided in accessible seating, the group shall be placed in a seating area with accessible seating so that, if possible, the group can sit together. If it is necessary to divide the group, it should be divided so that the individuals in the group who use wheelchairs are not isolated from their group.

(e) *Hold-and-release of tickets for accessible seating.*

(1) *Tickets for accessible seating may be released for sale in certain limited circumstances.* A public entity may release unsold tickets for accessible seating for sale to individuals without disabilities for their own use for a single event or series of events only under the following circumstances—

(i) When all non-accessible tickets (excluding luxury boxes, club boxes, or suites) have been sold;

(ii) When all non-accessible tickets in a designated seating area have been sold and the tickets for accessible seating are being released in the same designated area; or

(iii) When all non-accessible tickets in a designated price category have been sold and the tickets for accessible seating are being released within the same designated price category.

(2) *No requirement to release accessible tickets.* Nothing in this paragraph requires a facility to release tickets for accessible seating to individuals without disabilities for their own use.

(3) *Release of series-of-events tickets on a series-of-events basis.*

(i) *Series-of-events tickets sell-out when no ownership rights are attached.* When series-of-events tickets are sold out and a public entity releases and sells accessible seating to individuals without disabilities for a series of events, the public entity shall establish a process that prevents the automatic reassignment of the accessible seating to such ticket holders for future seasons, future years, or future series so that individuals with

disabilities who require the features of accessible seating and who become newly eligible to purchase tickets when these series-of-events tickets are available for purchase have an opportunity to do so.

(ii) *Series-of-events tickets when ownership rights are attached.* When series-of-events tickets with an ownership right in accessible seating areas are forfeited or otherwise returned to a public entity, the public entity shall make reasonable modifications in its policies, practices, or procedures to afford individuals with mobility disabilities or individuals with disabilities that require the features of accessible seating an opportunity to purchase such tickets in accessible seating areas.

(f) *Ticket transfer.* Individuals with disabilities who hold tickets for accessible seating shall be permitted to transfer tickets to third parties under the same terms and conditions and to the same extent as other spectators holding the same type of tickets, whether they are for a single event or series of events.

(g) *Secondary ticket market.*

(1) A public entity shall modify its policies, practices, or procedures to ensure that an individual with a disability may use a ticket acquired in the secondary ticket market under the same terms and conditions as other individuals who hold a ticket acquired in the secondary ticket market for the same event or series of events.

(2) If an individual with a disability acquires a ticket or series of tickets to an inaccessible seat through the secondary market, a public entity shall make reasonable modifications to its policies, practices, or procedures to allow the individual to exchange his ticket for one to an accessible seat in a comparable location if accessible seating is vacant at the time the individual presents the ticket to the public entity.

(h) *Prevention of fraud in purchase of tickets for accessible seating.* A public entity may not require proof of disability, including, for example, a doctor's note, before selling tickets for accessible seating.

(1) *Single-event tickets.* For the sale of single-event tickets, it is permissible to inquire whether the individual purchasing the tickets for accessible seating has a mobility disability or a disability that requires the use of the accessible features that are provided in accessible seating, or is purchasing the tickets for an individual who has a mobility disability or a disability that requires the use of the accessible features that are provided in the accessible seating.

(2) *Series-of-events tickets.* For series-of-events tickets, it is permissible to ask the individual purchasing the tickets for accessible seating to attest in writing that the accessible seating is for a person who has a mobility disability or a disability that requires the use of the accessible features that are provided in the accessible seating.

(3) *Investigation of fraud.* A public entity may investigate the potential misuse of accessible seating where there is good cause to believe that such seating has been purchased fraudulently.

## § 35.139 Direct threat.

(a) This part does not require a public entity to permit an individual to participate in or benefit from the services, programs, or activities of that public entity when that individual poses a direct threat to the health or safety of others.

(b) In determining whether an individual poses a direct threat to the health or safety of others, a public entity must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk.

## Subpart C—Employment

## § 35.140 Employment discrimination prohibited

(a) No qualified individual with a disability shall, on the basis of disability, be subjected to discrimination in employment under any service, program, or activity conducted by a public entity.

(b)

    (1) For purposes of this part, the requirements of title I of the Act, as established by the regulations of the Equal Employment Opportunity Commission in 29 CFR part 1630, apply to employment in any service, program, or activity conducted by a public entity if that public entity is also subject to the jurisdiction of title I.

    (2) For the purposes of this part, the requirements of section 504 of the Rehabilitation Act of 1973, as established by the regulations of the Department of Justice in 28 CFR part 41, as those requirements pertain to employment, apply to employment in any service, program, or activity conducted by a public entity if that public entity is not also subject to the jurisdiction of title I.

## §§ 35.141—35.148 [Reserved]

## Subpart D—Program Accessibility

## § 35.149 Discrimination prohibited.



Except as otherwise provided in § 35.150, no qualified individual with a disability shall, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

## § 35.150 Existing facilities

(a) *General.* A public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities. This paragraph does not—

    (1) Necessarily require a public entity to make each of its existing facilities accessible to and usable by individuals with disabilities;

    (2) Require a public entity to take any action that would threaten or destroy the historic significance of an historic property; or

    (3) Require a public entity to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens. In those circumstances where personnel of the public entity believe that the proposed action would fundamentally alter the service, program, or activity or would result in undue financial and administrative burdens, a public entity has the burden of proving that compliance with §35.150(a) of this part would result in such alteration or burdens. The decision that compliance would result in such alteration or burdens must be made by the head of a public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity, and must be accompanied by a written statement of the reasons for reaching that conclusion. If an action would result in such an alteration or such burdens, a public entity shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that individuals with disabilities receive the benefits or services provided by the public entity.

(b) *Methods.*

    (1) *General.* A public entity may comply with the requirements of this section through such means as redesign **or acquisition** of equipment, reassignment of services to accessible buildings, assignment of aides to beneficiaries, home visits, delivery of services at alternate accessible sites, alteration of existing facilities and construction of new facilities, use of accessible rolling stock or other conveyances, or any other methods that result in making its services, programs, or activities readily accessible to and usable by individuals with disabilities. A public entity is not required to make structural changes in existing facilities where other methods are effective in achieving compliance with

this section. A public entity, in making alterations to existing buildings, shall meet the accessibility requirements of § 35.151. In choosing among available methods for meeting the requirements of this section, a public entity shall give priority to those methods that offer services, programs, and activities to qualified individuals with disabilities in the most integrated setting appropriate.

(2)

(i) *Safe harbor.* **Elements that have not been altered in existing facilities on or after March 15, 2012, and that comply with the corresponding technical and scoping specifications for those elements in either the 1991 Standards or in the Uniform Federal Accessibility Standards (UFAS), Appendix A to 41 CFR part 101–19.6 (July 1, 2002 ed.), 49 FR 31528, app. A (Aug. 7, 1984) are not required to be modified in order to comply with the requirements set forth in the 2010 Standards.**

(ii) **The safe harbor provided in § 35.150(b)(2)(i) does not apply to those elements in existing facilities that are subject to supplemental requirements (*i.e.*, elements for which there are neither technical nor scoping specifications in the 1991 Standards). Elements in the 2010 Standards not eligible for the element-by-element safe harbor are identified as follows—**

(A) *Residential facilities dwelling units,* **sections 233 and 809.**

(B) *Amusement rides,* **sections 234 and 1002; 206.2.9; 216.12.**

(C) *Recreational boating facilities,* **sections 235 and 1003; 206.2.10.**

(D) *Exercise machines and equipment,* **sections 236 and 1004; 206.2.13.**

(E) *Fishing piers and platforms,* **sections 237 and 1005; 206.2.14.**

(F) *Golf facilities,* **sections 238 and 1006; 206.2.15.**

(G) *Miniature golf facilities,* **sections 239 and 1007; 206.2.16.**

(H) *Play areas,* **sections 240 and 1008; 206.2.17.**

(I) *Saunas and steam rooms,* **sections 241 and 612.**

(J) *Swimming pools, wading pools, and spas,* **sections 242 and 1009.**

(K) *Shooting facilities with firing positions,* **sections 243 and 1010.**

(L) *Miscellaneous.*

<u>(1)</u> *Team or player seating, section 221.2.1.4.*

<u>(2)</u> *Accessible route to bowling lanes, section. 206.2.11.*

<u>(3)</u> *Accessible route in court sports facilities, section 206.2.12.*

(3) *Historic preservation programs.* In meeting the requirements of § 35.150(a) in historic preservation programs, a public entity shall give priority to methods that provide physical access to individuals with disabilities. In cases where a physical alteration to an historic property is not required because of paragraph (a)(2) or (a)(3) of this section, alternative methods of achieving program accessibility include—

(i) Using audio-visual materials and devices to depict those portions of an historic property that cannot otherwise be made accessible;

(ii) Assigning persons to guide individuals with handicaps into or through portions of historic properties that cannot otherwise be made accessible; or

(iii) Adopting other innovative methods.

(c) *Time period for compliance.* Where structural changes in facilities are undertaken to comply with the obligations established under this section, such changes shall be made within three years of January 26, 1992, but in any event as expeditiously as possible.

(d) *Transition plan.*

(1) In the event that structural changes to facilities will be undertaken to achieve program accessibility, a public entity that employs 50 or more persons shall develop, within six months of January 26, 1992, a transition plan setting forth the steps necessary to complete such changes. A public entity shall provide an opportunity to interested persons, including individuals with disabilities or organizations representing individuals with disabilities, to participate in the development of the transition plan by submitting comments. A copy of the transition plan shall be made available for public inspection.

(2) If a public entity has responsibility or authority over streets, roads, or walkways, its transition plan shall include a schedule for providing curb ramps or other sloped areas where pedestrian walks cross curbs, giving priority to walkways serving entities covered by the Act, including State and local government offices and facilities, transportation, places of public accommodation, and employers, followed by walkways serving other areas.

(3) The plan shall, at a minimum—

(i) Identify physical obstacles in the public entity's facilities that limit the accessibility of its programs or activities to individuals with disabilities;

(ii) Describe in detail the methods that will be used to make the facilities accessible;

(iii) Specify the schedule for taking the steps necessary to achieve compliance with this section and, if the time period of the transition plan is longer than one year, identify steps that will be taken during each year of the transition period; and

(iv) Indicate the official responsible for implementation of the plan.

(4) If a public entity has already complied with the transition plan requirement of a Federal agency regulation implementing section 504 of the Rehabilitation Act of 1973, then the requirements of this paragraph (d) shall apply only to those policies and practices that were not included in the previous transition plan.

## § 35.151 New construction and alterations

(a) *Design and construction.*

(1) Each facility or part of a facility constructed by, on behalf of, or for the use of a public entity shall be designed and constructed in such manner that the facility or part of the facility is readily accessible to and usable by individuals with disabilities, if the construction was commenced after January 26, 1992.

(2) **Exception for structural impracticability.**

(i) **Full compliance with the requirements of this section is not required where a public entity can demonstrate that it is structurally impracticable to meet the requirements. Full compliance will be considered structurally impracticable only in those rare circumstances when the unique characteristics of terrain prevent the incorporation of accessibility features.**

(ii) **If full compliance with this section would be structurally impracticable, compliance with this section is required to the extent that it is not structurally impracticable. In that case, any portion of the facility that can be made accessible shall be made accessible to the extent that it is not structurally impracticable.**

(iii) **If providing accessibility in conformance with this section to individuals with certain disabilities (*e.g.*, those who use wheelchairs) would be structurally impracticable, accessibility shall nonetheless be ensured to persons with other types of disabilities, (*e.g.*, those who use crutches or who have sight, hearing, or mental impairments) in accordance with this section.**

(b) *Alterations.*

(1) Each facility or part of a facility altered by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility or part of the facility shall, to the maximum

extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities, if the alteration was commenced after January 26, 1992.

**(2)** The path of travel requirements of § 35.151(b)(4) shall apply only to alterations undertaken solely for purposes other than to meet the program accessibility requirements of § 35.150.

**(3)**

    **(i)** Alterations to historic properties shall comply, to the maximum extent feasible, with the provisions applicable to historic properties in the design standards specified in § 35.151(c).

    **(ii)** If it is not feasible to provide physical access to an historic property in a manner that will not threaten or destroy the historic significance of the building or facility, alternative methods of access shall be provided pursuant to the requirements of § 35.150.

**(4)** *Path of travel.* An alteration that affects or could affect the usability of or access to an area of a facility that contains a primary function shall be made so as to ensure that, to the maximum extent feasible, the path of travel to the altered area and the restrooms, telephones, and drinking fountains serving the altered area are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs, unless the cost and scope of such alterations is disproportionate to the cost of the overall alteration.

    **(i)** *Primary function.* A "primary function" is a major activity for which the facility is intended. Areas that contain a primary function include, but are not limited to, the dining area of a cafeteria, the meeting rooms in a conference center, as well as offices and other work areas in which the activities of the public entity using the facility are carried out.

        **(A)** Mechanical rooms, boiler rooms, supply storage rooms, employee lounges or locker rooms, janitorial closets, entrances, and corridors are not areas containing a primary function. Restrooms are not areas containing a primary function unless the provision of restrooms is a primary purpose of the area, *e.g.,* in highway rest stops.

        **(B)** For the purposes of this section, alterations to windows, hardware, controls, electrical outlets, and signage shall not be deemed to be alterations that affect the usability of or access to an area containing a primary function.

    **(ii)** A "path of travel" includes a continuous, unobstructed way of pedestrian passage by means of which the altered area may be approached, entered, and exited, and which connects the altered area with an exterior approach (including sidewalks, streets, and parking areas), an entrance to the facility, and other parts of the facility.

        **(A)** An accessible path of travel may consist of walks and sidewalks, curb ramps and other interior or exterior pedestrian ramps; clear floor paths through lobbies, corridors, rooms, and other improved areas; parking access aisles; elevators and lifts; or a combination of these elements.

        **(B)** For the purposes of this section, the term "path of travel" also includes the restrooms, telephones, and drinking fountains serving the altered area.

        **(C)** *Safe harbor.* If a public entity has constructed or altered required elements of a path of travel in accordance with the specifications in either the 1991 Standards or the Uniform Federal Accessibility Standards before March 15, 2012, the public entity is not required to retrofit such elements to reflect incremental changes in the 2010 Standards solely because of an alteration to a primary function area served by that path of travel.

    **(iii)** *Disproportionality.*

        **(A)** Alterations made to provide an accessible path of travel to the altered area will be deemed disproportionate to the overall alteration when the cost exceeds 20 %

Text of the Revised Title II Regulation

of the cost of the alteration to the primary function area.

(B) Costs that may be counted as expenditures required to provide an accessible path of travel may include:

   (1) Costs associated with providing an accessible entrance and an accessible route to the altered area, for example, the cost of widening doorways or installing ramps;

   (2) Costs associated with making restrooms accessible, such as installing grab bars, enlarging toilet stalls, insulating pipes, or installing accessible faucet controls;

   (3) Costs associated with providing accessible telephones, such as relocating the telephone to an accessible height, installing amplification devices, or installing a text telephone (TTY); and

   (4) Costs associated with relocating an inaccessible drinking fountain.

(iv) *Duty to provide accessible features in the event of disproportionality.*

   (A) When the cost of alterations necessary to make the path of travel to the altered area fully accessible is disproportionate to the cost of the overall alteration, the path of travel shall be made accessible to the extent that it can be made accessible without incurring disproportionate costs.

   (B) In choosing which accessible elements to provide, priority should be given to those elements that will provide the greatest access, in the following order—

      (1) An accessible entrance;

      (2) An accessible route to the altered area;

      (3) At least one accessible restroom for each sex or a single unisex restroom;

      (4) Accessible telephones;

      (5) Accessible drinking fountains; and

      (6) When possible, additional accessible elements such as parking, storage, and alarms.

(v) *Series of smaller alterations.*

   (A) The obligation to provide an accessible path of travel may not be evaded by performing a series of small alterations to the area served by a single path of travel if those alterations could have been performed as a single undertaking.

   (B)

      (1) If an area containing a primary function has been altered without providing an accessible path of travel to that area, and subsequent alterations of that area, or a different area on the same path of travel, are undertaken within three years of the original alteration, the total cost of alterations to the primary function areas on that path of travel during the preceding three-year period shall be considered in determining whether the cost of making that path of travel accessible is disproportionate.

      (2) Only alterations undertaken on or after March 15, 2011 shall be considered in determining if the cost of providing an accessible path of travel is disproportionate to the overall cost of the alterations.

(c) *Accessibility standards and compliance date.*

(1) If physical construction or alterations commence after July 26, 1992, but prior to September 15, 2010, then new construction and alterations subject to this section must comply with either the UFAS or the 1991 Standards except that the elevator exemption contained at section 4.1.3(5) and section 4.1.6(1)(k) of the 1991 Standards shall not apply. Departures from particular requirements of either standard by the use of other methods shall be permitted when it is clearly evident that equivalent access to the facility or part of the facility is thereby provided.

(2) If physical construction or alterations commence on or after September 15, 2010, and before March 15, 2012, then new construction and alterations subject to this section may comply with one of the following: the 2010 Standards, UFAS, or the 1991 Standards except that the elevator exemption contained at section 4.1.3(5) and section 4.1.6(1)(k) of the 1991 Standards shall not apply. Departures from particular requirements of either standard by the use of other methods shall be permitted when it is clearly evident that equivalent access to the facility or part of the facility is thereby provided.

(3) If physical construction or alterations commence on or after March 15, 2012, then new construction and alterations subject to this section shall comply with the 2010 Standards.

(4) For the purposes of this section, ceremonial groundbreaking or razing of structures prior to site preparation do not commence physical construction or alterations.

(5) *Noncomplying new construction and alterations.*

    (i) Newly constructed or altered facilities or elements covered by §§ 35.151(a) or (b) that were constructed or altered before March 15, 2012, and that do not comply with the 1991 Standards or with UFAS shall before March 15, 2012, be made accessible in accordance with either the 1991 Standards, UFAS, or the 2010 Standards.

    (ii) Newly constructed or altered facilities or elements covered by §§ 35.151(a) or (b) that are constructed or altered on or after March 15, 2012, and that do not comply with the 1991 Standards or with UFAS shall, on or after March 15, 2012, be made accessible in accordance with the 2010 Standards.

## Appendix to § 35.151(c)

| Compliance Date for New Construction or Alterations | Applicable Standards |
|---|---|
| Before September 15, 2010 | 1991 Standards or UFAS |
| On or after September 15, 2010, and before March 15, 2012 | 1991 Standards, UFAS, or 2010 Standards |
| On or after March 15, 2012 | 2010 Standards |

(d) *Scope of coverage.* The 1991 Standards and the 2010 Standards apply to fixed or built-in elements of buildings, structures, site improvements, and pedestrian routes or vehicular ways located on a site. Unless specifically stated otherwise, the advisory notes, appendix notes, and figures contained in the 1991 Standards and the 2010 Standards explain or illustrate the requirements of the rule; they do not establish enforceable requirements.

(e) *Social service center establishments.* Group homes, halfway houses, shelters, or similar social service center establishments that provide either temporary sleeping accommodations or residential dwelling units that are subject to this section shall comply with the provisions of the 2010 Standards applicable to residential facilities, including, but not limited to, the provisions in sections 233 and 809.

    (1) In sleeping rooms with more than 25 beds covered by this section, a minimum of 5% of the beds shall have clear floor space complying with section 806.2.3 of the 2010 Standards.

    (2) Facilities with more than 50 beds covered by this section that provide common use bathing facilities, shall provide at least one roll-in shower with a seat that complies with the relevant provisions of section 608 of the 2010 Standards. Transfer-type showers are not permitted in lieu of a roll-in shower with a seat, and the exceptions in sections 608.3 and 608.4 for residential

dwelling units are not permitted. When separate shower facilities are provided for men and for women, at least one roll-in shower shall be provided for each group.

(f) *Housing at a place of education.* Housing at a place of education that is subject to this section shall comply with the provisions of the 2010 Standards applicable to transient lodging, including, but not limited to, the requirements for transient lodging guest rooms in sections 224 and 806 subject to the following exceptions. For the purposes of the application of this section, the term "sleeping room" is intended to be used interchangeably with the term "guest room" as it is used in the transient lodging standards.

    (1) Kitchens within housing units containing accessible sleeping rooms with mobility features (including suites and clustered sleeping rooms) or on floors containing accessible sleeping rooms with mobility features shall provide turning spaces that comply with section 809.2.2 of the 2010 Standards and kitchen work surfaces that comply with section 804.3 of the 2010 Standards.

    (2) Multi-bedroom housing units containing accessible sleeping rooms with mobility features shall have an accessible route throughout the unit in accordance with section 809.2 of the 2010 Standards.

    (3) Apartments or townhouse facilities that are provided by or on behalf of a place of education, which are leased on a year-round basis exclusively to graduate students or faculty, and do not contain any public use or common use areas available for educational programming, are not subject to the transient lodging standards and shall comply with the requirements for residential facilities in sections 233 and 809 of the 2010 Standards.

(g) *Assembly areas.* Assembly areas subject to this section shall comply with the provisions of the 2010 Standards applicable to assembly areas, including, but not limited to, sections 221 and 802. In addition, assembly areas shall ensure that—

    (1) In stadiums, arenas, and grandstands, wheelchair spaces and companion seats are dispersed to all levels that include seating served by an accessible route;

    (2) Assembly areas that are required to horizontally disperse wheelchair spaces and companion seats by section 221.2.3.1 of the 2010 Standards and have seating encircling, in whole or in part, a field of play or performance area shall disperse wheelchair spaces and companion seats around that field of play or performance area;

    (3) Wheelchair spaces and companion seats are not located on (or obstructed by) temporary platforms or other movable structures, except that when an entire seating section is placed on temporary platforms or other movable structures in an area where fixed seating is not provided, in order to increase seating for an event, wheelchair spaces and companion seats may be placed in that section. When wheelchair spaces and companion seats are not required to accommodate persons eligible for those spaces and seats, individual, removable seats may be placed in those spaces and seats;

    (4) Stadium-style movie theaters shall locate wheelchair spaces and companion seats on a riser or cross-aisle in the stadium section that satisfies at least one of the following criteria—

        (i) It is located within the rear 60% of the seats provided in an auditorium; or

        (ii) It is located within the area of an auditorium in which the vertical viewing angles (as measured to the top of the screen) are from the 40th to the 100th percentile of vertical viewing angles for all seats as ranked from the seats in the first row (1st percentile) to seats in the back row (100th percentile).

(h) *Medical care facilities.* Medical care facilities that are subject to this section shall comply with the provisions of the 2010 Standards applicable to medical care facilities, including, but not limited to, sections 223 and 805. In addition, medical care facilities that do not specialize in the treatment of conditions that affect mobility shall disperse the accessible patient bedrooms required by section 223.2.1 of the 2010 Standards in a manner that is proportionate by type of medical specialty.

(i) *Curb ramps.*

(1) Newly constructed or altered streets, roads, and highways must contain curb ramps or other sloped areas at any intersection having curbs or other barriers to entry from a street level pedestrian walkway.

(2) Newly constructed or altered street level pedestrian walkways must contain curb ramps or other sloped areas at intersections to streets, roads, or highways.

(j) *Facilities with residential dwelling units for sale to individual owners.*

(1) Residential dwelling units designed and constructed or altered by public entities that will be offered for sale to individuals shall comply with the requirements for residential facilities in the 2010 Standards including sections 233 and 809.

(2) The requirements of paragraph (1) also apply to housing programs that are operated by public entities where design and construction of particular residential dwelling units take place only after a specific buyer has been identified. In such programs, the covered entity must provide the units that comply with the requirements for accessible features to those pre-identified buyers with disabilities who have requested such a unit.

(k) *Detention and correctional facilities.*

(1) New construction of jails, prisons, and other detention and correctional facilities shall comply with the 2010 Standards except that public entities shall provide accessible mobility features complying with section 807.2 of the 2010 Standards for a minimum of 3%, but no fewer than one, of the total number of cells in a facility. Cells with mobility features shall be provided in each classification level.

(2) *Alterations to detention and correctional facilities.* Alterations to jails, prisons, and other detention and correctional facilities shall comply with the 2010 Standards except that public entities shall provide accessible mobility features complying with section 807.2 of the 2010 Standards for a minimum of 3%, but no fewer than one, of the total number of cells being altered until at least 3%, but no fewer than one, of the total number of cells in a facility shall provide mobility features complying with section 807.2. Altered cells with mobility features shall be provided in each classification level. However, when alterations are made to specific cells, detention and correctional facility operators may satisfy their obligation to provide the required number of cells with mobility features by providing the required mobility features in substitute cells (cells other than those where alterations are originally planned), provided that each substitute cell—

(i) Is located within the same prison site;

(ii) Is integrated with other cells to the maximum extent feasible;

(iii) Has, at a minimum, equal physical access as the altered cells to areas used by inmates or detainees for visitation, dining, recreation, educational programs, medical services, work programs, religious services, and participation in other programs that the facility offers to inmates or detainees; and,

(iv) If it is technically infeasible to locate a substitute cell within the same prison site, a substitute cell must be provided at another prison site within the corrections system.

(3) With respect to medical and long-term care facilities in jails, prisons, and other detention and correctional facilities, public entities shall apply the 2010 Standards technical and scoping requirements for those facilities irrespective of whether those facilities are licensed.

## § 35.152 Jails, detention and correctional facilities, and community correctional facilities.

(a) *General.* This section applies to public entities that are responsible for the operation or management of adult and juvenile justice jails, detention and correctional facilities, and community correctional facilities, either directly or through contractual, licensing, or other arrangements with public or private entities, in whole or in part, including private correctional facilities.

(b) *Discrimination prohibited.*

(1) Public entities shall ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

(2) Public entities shall ensure that inmates or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals. Unless it is appropriate to make an exception, a public entity–

   (i) Shall not place inmates or detainees with disabilities in inappropriate security classifications because no accessible cells or beds are available;

   *Housing me in a known elevated risk. Showers Moldy*

   (ii) Shall not place inmates or detainees with disabilities in designated medical areas unless they are actually receiving medical care or treatment;

   (iii) Shall not place inmates or detainees with disabilities in facilities that do not offer the same programs as the facilities where they would otherwise be housed; and

   (iv) Shall not deprive inmates or detainees with disabilities of visitation with family members by placing them in distant facilities where they would not otherwise be housed.

   *Could have moved me by policy.*

(3) Public entities shall implement reasonable policies, including physical modifications to additional cells in accordance with the 2010 Standards, so as to ensure that each inmate with a disability is housed in a cell with the accessible elements necessary to afford the inmate access to safe, appropriate housing.

## §§ 35.153—35.159 [Reserved]

## Subpart E—Communications

## § 35.160 General.

(a)

   (1) A public entity shall take appropriate steps to ensure that communications with applicants, participants, members of the public, **and companions with disabilities** are as effective as communications with others.

   (2) For purposes of this section, "companion" means a family member, friend, or associate of an individual seeking access to a service, program, or activity of a public entity, who, along with such individual, is an appropriate person with whom the public entity should communicate.

(b)

   (1) A public entity shall furnish appropriate auxiliary aids and services where necessary to afford qualified individuals with disabilities, **including applicants, participants, companions, and members of the public**, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity.

   (2) The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place. In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.

(c)

   (1) A public entity shall not require an individual with a disability to bring another individual to interpret for him or her.

(2) A public entity shall not rely on an adult accompanying an individual with a disability to interpret or facilitate communication except—

(i) In an emergency involving an imminent threat to the safety or welfare of an individual or the public where there is no interpreter available; or

(ii) Where the individual with a disability specifically requests that the accompanying adult interpret or facilitate communication, the accompanying adult agrees to provide such assistance, and reliance on that adult for such assistance is appropriate under the circumstances.

(3) A public entity shall not rely on a minor child to interpret or facilitate communication, except in an emergency involving an imminent threat to the safety or welfare of an individual or the public where there is no interpreter available.

(d) *Video remote interpreting (VRI) services.* A public entity that chooses to provide qualified interpreters via VRI services shall ensure that it provides—

(1) Real-time, full-motion video and audio over a dedicated high-speed, wide-bandwidth video connection or wireless connection that delivers high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication;

(2) A sharply delineated image that is large enough to display the interpreter's face, arms, hands, and fingers, and the participating individual's face, arms, hands, and fingers, regardless of his or her body position;

(3) A clear, audible transmission of voices; and

(4) Adequate training to users of the technology and other involved individuals so that they may quickly and efficiently set up and operate the VRI.

## § 35.161 Telecommunications.

(a) Where a public entity communicates by telephone with applicants and beneficiaries, **text telephones (TTYs)** or equally effective telecommunications systems shall be used to communicate with individuals **who are deaf or hard of hearing or have speech impairments.**

(b) **When a public entity uses an automated-attendant system, including, but not limited to, voice mail and messaging, or an interactive voice response system, for receiving and directing incoming telephone calls, that system must provide effective real-time communication with individuals using auxiliary aids and services, including TTYs and all forms of FCC-approved telecommunications relay system, including Internet-based relay systems.**

(c) **A public entity shall respond to telephone calls from a telecommunications relay service established under title IV of the ADA in the same manner that it responds to other telephone calls.**

## § 35.162 Telephone emergency services

Telephone emergency services, including 911 services, shall provide direct access to individuals who use TDD's and computer modems.

## § 35.163 Information and signage

(a) A public entity shall ensure that interested persons, including persons with impaired vision or hearing, can obtain information as to the existence and location of accessible services, activities, and facilities.

(b) A public entity shall provide signage at all inaccessible entrances to each of its facilities, directing users to an accessible entrance or to a location at which they can obtain information about accessible facilities. The international symbol for accessibility shall be used at each accessible entrance of a facility.

## § 35.164 Duties

This subpart does not require a public entity to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens. In those circumstances where personnel of the public entity believe that the proposed action would fundamentally alter the service, program, or activity or would result in undue financial and administrative burdens, a public entity has the burden of proving that compliance with this subpart would result in such alteration or burdens. The decision that compliance would result in such alteration or burdens must be made by the head of the public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity and must be accompanied by a written statement of the reasons for reaching that conclusion. If an action required to comply with this subpart would result in such an alteration or such burdens, a public entity shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that, to the maximum extent possible, individuals with disabilities receive the benefits or services provided by the public entity.

## §§ 35.165—35.169 [Reserved]

## Subpart F—Compliance Procedures

## § 35.170 Complaints

(a) *Who may file.* An individual who believes that he or she or a specific class of individuals has been subjected to discrimination on the basis of disability by a public entity may, by himself or herself or by an authorized representative, file a complaint under this part.

(b) *Time for filing.* A complaint must be filed not later than 180 days from the date of the alleged discrimination, unless the time for filing is extended by the designated agency for good cause shown. A complaint is deemed to be filed under this section on the date it is first filed with any Federal agency.

(c) *Where to file.* An individual may file a complaint with any agency that he or she believes to be the appropriate agency designated under subpart G of this part, or with any agency that provides funding to the public entity that is the subject of the complaint, or with the Department of Justice for referral as provided in §35.171(a)(2).

## § 35.171 Acceptance of complaints

(a) *Receipt of complaints.*

(1)

(i) Any Federal agency that receives a complaint of discrimination on the basis of disability by a public entity shall promptly review the complaint to determine whether it has jurisdiction over the complaint under section 504.

(ii) If the agency does not have section 504 jurisdiction, it shall promptly determine whether it is the designated agency under subpart G of this part responsible for complaints filed against that public entity.

(2)

(i) If an agency other than the Department of Justice determines that it does not have section 504 jurisdiction and is not the designated agency, it shall promptly refer the complaint **to the appropriate designated agency, the agency that has section 504 jurisdiction, or the Department of Justice, and so notify the complainant.**

(ii) When the Department of Justice receives a complaint for which it does not have jurisdiction under section 504 and is not the designated agency, **it may exercise jurisdiction pursuant to § 35.190(e)** or refer the complaint to an agency that does have jurisdiction under section 504 or to the appropriate agency designated in subpart G of this part or, in the case of an employment complaint that is also subject to title I of the Act, to the Equal Employment Opportunity Commission.

(3)

(i) If the agency that receives a complaint has section 504 jurisdiction, it shall process the complaint according to its procedures for enforcing section 504.

(ii) If the agency that receives a complaint does not have section 504 jurisdiction, but is the designated agency, it shall process the complaint according to the procedures established by this subpart.

(b) *Employment complaints.*

(1) If a complaint alleges employment discrimination subject to title I of the Act, and the agency has section 504 jurisdiction, the agency shall follow the procedures issued by the Department of Justice and the Equal Employment Opportunity Commission under section 107(b) of the Act.

(2) If a complaint alleges employment discrimination subject to title I of the Act, and the designated agency does not have section 504 jurisdiction, the agency shall refer the complaint to the Equal Employment Opportunity Commission for processing under title I of the Act.

(3) Complaints alleging employment discrimination subject to this part, but not to title I of the Act shall be processed in accordance with the procedures established by this subpart.

(c) *Complete complaints.*

(1) A designated agency shall accept all complete complaints under this section and shall promptly notify the complainant and the public entity of the receipt and acceptance of the complaint.

(2) If the designated agency receives a complaint that is not complete, it shall notify the complainant and specify the additional information that is needed to make the complaint a complete complaint. If the complainant fails to complete the complaint, the designated agency shall close the complaint without prejudice.

## § 35.172 **Investigations and compliance reviews.**

(a) **The designated agency shall investigate complaints for which it is responsible under § 35.171.**

(b) **The designated agency may conduct compliance reviews of public entities in order to ascertain whether there has been a failure to comply with the nondiscrimination requirements of this part.**

(c) **Where appropriate, the designated agency shall attempt informal resolution of any matter being investigated under this section, and, if resolution is not achieved and a violation is found, issue to the public entity and the complainant, if any, a Letter of Findings that shall include—**

(1) **Findings of fact and conclusions of law;**

(2) **A description of a remedy for each violation found (including compensatory damages where appropriate); and**

(3) **Notice of the rights and procedures available under paragraph (d) of this section and §§ 35.173 and 35.174.**

(d) **At any time, the complainant may file a private suit pursuant to section 203 of the Act, 42 U.S.C. 12133, whether or not the designated agency finds a violation.**

## § 35.173 Voluntary compliance agreements

(a) When the designated agency issues a noncompliance Letter of Findings, the designated agency shall—

(1) Notify the Assistant Attorney General by forwarding a copy of the Letter of Findings to the Assistant Attorney General; and

(2) Initiate negotiations with the public entity to secure compliance by voluntary means.

(b) Where the designated agency is able to secure voluntary compliance, the voluntary compliance agreement shall —

(1) Be in writing and signed by the parties;

(2) Address each cited violation;

(3) Specify the corrective or remedial action to be taken, within a stated period of time, to come into compliance;

(4) Provide assurance that discrimination will not recur; and

(5) Provide for enforcement by the Attorney General.

## § 35.174 Referral.

If the public entity declines to enter into voluntary compliance negotiations or if negotiations are unsuccessful, the designated agency shall refer the matter to the Attorney General with a recommendation for appropriate action.

## § 35.175 Attorney's fees.

In any action or administrative proceeding commenced pursuant to the Act or this part, the court or agency, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee, including litigation expenses, and costs, and the United States shall be liable for the foregoing the same as a private individual.

## § 35.176 Alternative means of dispute resolution.

Where appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including settlement negotiations, conciliation, facilitation, mediation, factfinding, minitrials, and arbitration, is encouraged to resolve disputes arising under the Act and this part.

## § 35.177 Effect of unavailability of technical assistance.

A public entity shall not be excused from compliance with the requirements of this part because of any failure to receive technical assistance, including any failure in the development or dissemination of any technical assistance manual authorized by the Act.

## § 35.178 State immunity.

A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this Act. In any action against a State for a violation of the requirements of this Act, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a State.

## §§ 35.179—35.189 [Reserved]

## Subpart G—Designated Agencies

## § 35.190 Designated Agencies.

(a) The Assistant Attorney General shall coordinate the compliance activities of Federal agencies with respect to State and local government components, and shall provide policy guidance and interpretations to designated agencies to ensure the consistent and effective implementation of the requirements of this part.

(b) The Federal agencies listed in paragraph (b)(1)-(8) of this section shall have responsibility for the implementation of subpart F of this part for components of State and local governments that exercise responsibilities, regulate, or administer services, programs, or activities in the following functional areas.

(1) *Department of Agriculture*: All programs, services, and regulatory activities relating to farming and the raising of livestock, including extension services.

(2) *Department of Education*: All programs, services, and regulatory activities relating to the operation of elementary and secondary education systems and institutions, institutions of higher education and

vocational education (other than schools of medicine, dentistry, nursing, and other health-related schools), and libraries.

(3) *Department of Health and Human Services*: All programs, services, and regulatory activities relating to the provision of health care and social services, including schools of medicine, dentistry, nursing, and other health-related schools, the operation of health care and social service providers and institutions, including "grass-roots" and community services organizations and programs, and preschool and daycare programs.

(4) *Department of Housing and Urban Development*: All programs, services, and regulatory activities relating to state and local public housing, and housing assistance and referral.

(5) *Department of Interior*: All programs, services, and regulatory activities relating to lands and natural resources, including parks and recreation, water and waste management, environmental protection, energy, historic and cultural preservation, and museums.

(6) *Department of Justice*: All programs, services, and regulatory activities relating to law enforcement, public safety, and the administration of justice, including courts and correctional institutions; commerce and industry, including general economic development, banking and finance, consumer protection, insurance, and small business; planning, development, and regulation (unless assigned to other designated agencies); state and local government support services (*e.g.*, audit, personnel, comptroller, administrative services); all other government functions not assigned to other designated agencies.

(7) *Department of Labor*: All programs, services, and regulatory activities relating to labor and the work force.

(8) *Department of Transportation*: All programs, services, and regulatory activities relating to transportation, including highways, public transportation, traffic management (non-law enforcement), automobile licensing and inspection, and driver licensing.

(c) Responsibility for the implementation of subpart F of this part for components of State or local governments that exercise responsibilities, regulate, or administer services, programs, or activities relating to functions not assigned to specific designated agencies by paragraph (b) of this section may be assigned to other specific agencies by the Department of Justice.

(d) If two or more agencies have apparent responsibility over a complaint, the Assistant Attorney General shall determine which one of the agencies shall be the designated agency for purposes of that complaint.

(e) **When the Department receives a complaint directed to the Attorney General alleging a violation of this part that may fall within the jurisdiction of a designated agency or another Federal agency that may have jurisdiction under section 504, the Department may exercise its discretion to retain the complaint for investigation under this part.**

## §§ 35.191—35.999 [Reserved]

---

ADA Home Page | Regulation Home Page

last updated, February 3, 2012

**DECLARATION**
(ORCP Rule 1E)

I, _Aaron Dale Eaton_, do declare that:

During my entire time at T.R.C.I, I was never Treated for the Mold exposure that I repeatedly informed both Provider Lecloux and Provider Massey of on multiple medical visits.
Both providers treated me for asthma but not for the exposure to toxic black molds that I complained about.

"I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE FOR USE AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY."

Dated this _9th_ day of _March_, 20_22_.

_Aaron Dale Eaton_
(Signature)

Print Name: _Aaron Dale Eaton_
S.I.D. No. _14997682_

Page 1 of 1–Declaration                                    Form 04.015

**DECLARATION**
(ORCP Rule 1E)

I, Aaron Dale Eaton , do declare that:

To The best of my understanding when TRCI had the shower-s remodeled and the mold removed The "crew" doing the removing did not follow OSHA standards and I saw all the Mold under the Tiles.

"I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE FOR USE AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY."

Dated this 27 day of Oct , 2021.

(Signature)

Print Name: Aaron Dale Eaton
S.I.D. No. 14957682

Form 04.015

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF OREGON**

_Aaron Dale Eaton,_
     **PLAINTIFF**

CASE NO. _2:20-cv-01251-SI_

**V**

Two Rivers Correctional Institution
Grievance coordinator Rossi;
Two Rivers Correctional Institution
Physical Plant Manager Stark;
Two Rivers Correctional Institution
Physical Plant Asst. Manager Darcy;
Two Rivers Correctional Institution
Superintendent T. Blewett;
The Oregon Dept. Of Corrections.

# EXHIBIT

**DECLARATION OF**
_Aaron Dale Eaton_

     **DEFENDANTS**

     I _Aaron Dale Eaton_ , Do declare that the following is true and correct to

the best of my personal first hand knowledge and my personal belief;

     I have resided here at Two Rivers Correctional Institution (T.R.C.I.) 82911 Beach Access

Road Umatilla, OR. 97882 Phone Number (541) 922-6050 in the care and custody of O.D.O.C.

Since:_____.

_The mold in the unit showers is still growing_
_back every time one of the unit orderlies try_
_to clean the showers, the showers smell and_
_look good for about 3 to 5 days, Then The_
_smell of mildew, mold comes back once we can_
_smell the mold all we do is look were it was_
_and it's back again over and over physical plant will not come fix_
_the showers_

**"I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST OF MY**
**KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE FOR USE AS**
**EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY."**
Dated this _24_ day of _July_ 2020.       _Aaron Dale Eaton_

# EXHIBIT

**DECLARATION**
( ORCP Rule 1E ) ( 28 USC § 1746 )

I, _Robert Jerome Byers_ AIC at TRCI, do declare that:

1. I am a first person witness over the age of 18 and am competent to give account of the facts reported within this declaration or I have actual first hand knowledge of the events that I am testifying to by giving this statement.

Today I am experiencing a pretty heavy presure in my chest and it is very hard to breath. I had to use my inhaler around 5:15 am this morning and around 7:48 am. I am wheezing and my chest burns. All night last night I couldn't sleep well because my skin iched all over all night. I am worried because of the COVID-19 outbreak and my respirtory issues I'm having because if I go to medical they will punish me — not by a Quaranteen — but because they will neglect me for all of my meals. I just watch members of VCE go on quarantine and the kitchen treated all of them wrong. Not giving them our portions, feeding them cold food, 1/2 portions, warm and spoiled milk, and feeding them all late. I know I'm having a reaction from mold exposure, I just didit think it would got like this.

"I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE FOR USE AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY."

Dated this _12_ day of _May_ 2020.

_Robert J. Byers_
(Signature)
Print Name: _Robert J. Byers_
S.I.D. No. _10311965_
82911 Beach Access Rd.
Umatilla, OR. 97882

PAGE 1 Of 1 DECLARATION

# EXHIBIT

# DECLARATION
( ORCP Rule 1E ) ( 28 USC § 1746 )
**(WHISTLE BLOWER DECLARATION PLEASE PROTECT IDENTITY)**

I, Robert Jerome Byers _____ **(PLEASE PROTECT IDENTITY)**
AIC at TRCI, do declare that:

     I am a first person witness over the age of 18 and am competent to give account of the facts reported within this declaration or I have actual first hand knowledge of the events that I am testifying to by giving this statement and I am under no form of duress and make this declaration on my own free will.

I was working (I'm a unit 2 orderly) when Mr. Stark walked on the unit with others with him, they were looking at the showers. I asked Stark to come look at something in the shower utility closet, following me into the closet, I pointed out some mildew, mold, dirt all caked into the grout, Tiles, walls and asked him what it was, Stark said "Mold and crap" I asked him to put in a workorder and Stark said "yeah I'll do that today"

It is now the last day of the year and the mold is still in the closet and No personel has come in response to any workorder That Stark said he would put in.

"I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE FOR USE AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY."

Dated this 31st day of December _____, 2020.

_____
(Signature)
Print Name: Robert J. Byers .
S.I.D. No. 10311965 .
82911 Beach Access Rd.
Umatilla, OR. 97882

PAGE  1 Of 1 DECLARATION

# DECLARATION
( ORCP Rule 1E ) ( 28 USC § 1746 )
## (WHISTLE BLOWER DECLARATION PLEASE PROTECT IDENTITY)

I, Aaron Dale Eaton _____ **(PLEASE PROTECT IDENTITY)**
AIC at TRCI, do declare that:

I am a first person witness over the age of 18 and am competent to give account of the facts reported within this declaration or I have actual first hand knowledge of the events that I am testifying to by giving this statement and I am under no form of duress and make this declaration on my own free will.

1). I seen mold in all of T.R.C.I's Unit 2 showers. 2). The mold would grow back after the orderlies attempted to clean the showers. 3). Unit staff was notified several times, Superintendet T. Blewett's office, T.R.C.I's physical plant, T.R.C.I's Medical dept. 4). L. Simmon responded for T. Blewitt 5). I notified Medical that I was exposed to molds and it was effecting my ability to breath, after two different types of pulmonary function tests and several weeks of complaining and the Albuterol not working I was prescribed "fluticasone" a long storied. 6). These prescriptions were issued by Provider Maury and Provider Lecloux. I wrote several medical communications informing "Medical Provider" that the "inhalers" were not working. 7). The medical dept. at T.R.C.I took no further steps to diagnose me for environmental mold exposure, even after Mr. Byers was medically deemed exposed to environmental molds and prescribed the proper medication. 8). T.R.C.I medical does "moves" all the time and could have moved me off of unit 2 at any time.

"I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE FOR USE AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY."

Dated this 18 day of July, 2021 , ~~2020~~.

AE

Aaron Dale Eaton
(Signature)
Print Name: Aaron Dale Eaton .
S.I.D. No. 19997682 .
~~32911 Beach Access Rd.~~ 777 Stanton Blvd
AE ~~Umatilla, OR. 97882~~ Ontario Or. 97914

PAGE 1 Of 1 DECLARATION

**DECLARATION**
(ORCP Rule 1E)

I, _Aaron Dale Eaton_ , do declare that:

During My Time at TRCI, while the
showers were infested with molds, I
was not able to breath properly for
the entire length of my shower.
I would need to hurry up, so much so
That C/o Willis and C/o Vanderwalker would
Tell me "Man you are fast in a shower"
I would Tell Them "I cant breath in
These Shows"

"I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST OF MY

KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE FOR USE AS

EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY."

Dated this _1_ day of _November_ , 20_20_.

_Aaron Dale Eaton_
(Signature)

Print Name: _Aaron Dale Eaton_
S.I.D. No. _14997687_

**DECLARATION**
(ORCP Rule 1E)

I, _Aaron Dale Eaton_, do declare that:

The exposure to the shower mold did and
continues to significantly affect my daily activities.
I am unable to breath and all the providers
I have talked to (Manoy and Leclaux) Treated
me for asthma yet did not take any steps
to Treat or diagnose me even after I continued
to complain after the asthma inhaiter) were
prescribed to me.
Dr. Gulick has Just ordered "imaging and P.F.T with
a recommadation to see a pulmonary specialist.

"I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST OF MY

KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE FOR USE AS

EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY."

Dated this _4_ day of _March_, 20 _22_.

_____
(Signature)

Print Name: _____
S.I.D. No. _____

_____
_____
_____

**DECLARATION**
(ORCP Rule 1E)

I, _Aaron Dale Eaton_, do declare that:

My Pulmonary function Test That I Just had
with Nurse Nicklesen here at S.R.C.I
ordered by Gulick showed a peliminary
result of adnormal breathing conditions
I have also Just settled a case where ODOC
will have To diagnose and Treat my breathing issues

"I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST OF MY

KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE FOR USE AS

EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY."

Dated this _28_ day of _Feb_____, 20_22_.

_Aaron Dale Eaton_
(Signature)

Print Name: _Aaron Dale Eaton_
S.I.D. No. ____14997682_____

Form 04.015

## CERTIFICATE OF SERVICE

CASE NAME: _Eaton_ v. _Eynon et al._

CASE NUMBER: (if known) _2:20-CV-01251-SI_

COMES NOW, _Aaron Dale Eaton_, and certifies the following:

That I am incarcerated by the Oregon Department of Corrections at _S.R.C.F_

That on the _9th_ day of _March_, 20_22_, I personally placed in the Correctional Institution's mailing service A TRUE COPY of the following:

_Response to Summary Judgment with exhibits_

I placed the above in a securely enclosed, postage prepaid envelope, to the person(s) named at the places addressed below:

_(Signature)_

Print Name _Aaron Eaton_
S.I.D. No.: _14467652_

Form 03.015